[Sac. No. 3790. In Bank.—June 11, 1927.]

## J. F. DUDLEY et al., Appellants, v. ORRIN J. LOWELL, District Attorney, etc., et al., Respondents.

[1] ALIEN LAND LAW — CROPPING AGREEMENT — INVALIDITY OF.—An agreement proposed to be entered into between an owner of agricultural land of this state and a Japanese subject which would let the alien into possession of the land, with complete control of the cultivating, harvesting, handling, and delivery of the crop grown thereon, as an independent contractor or operator, with unlimited discretion as to hours and seasons of labor, number, class, residence, and wages of his employees, with independent liability for injury and damage to equipment and independent responsibility for industrial accidents, and insurance of all appropriate types being demanded of him, would be a cropping contract and one specifically forbidden by the 1923 amendment to the state Alien Land Act.

[2] ID.—PUBLIC POLICY — OCCUPANCY OF AGRICULTURAL LAND.—The concern of the state does not stop with ownership or control of agricultural lands but it extends to occupancy thereof as well.

⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺

(1) 2 C. J., p. 1050, n. 65.    (2) 2 C. J., p. 1049, n. 59, p. 1050, n. 65; 12 C. J., p. 1130, n. 24.

APPEAL from a judgment of the Superior Court of Placer County. J. B. Landis, Judge. Affirmed.

The facts are stated in the opinion of the court.

Dozier, Kimball & Dozier for Appellants.

U. S. Webb, Attorney-General, Frank English, Deputy Attorney-General, and Orrin J. Lowell, District Attorney, for Respondents.

PRESTON, J.—This is an appeal from a judgment of dismissal after general demurrer sustained to the complaint without leave to amend.

Plaintiff, J. F. Dudley, alleges himself to be the owner of a tract of land and desires to enter into what he calls a contract of employment with one Y. Hayakawa, a Japanese subject and resident of this state, for the cultivation, harvesting, and delivering of the crops to be grown on said property for the year beginning October 1, 1924, and ending September 30, 1925. The usual allegations appear which show that defendants, the Attorney-General of the state, and county of Placer, are threatening to cause the property to be taken without due process of law and to escheat it to the state, if said contract be entered into, and also to prosecute parties plaintiff criminally for violation of a statute of November 2, 1920 (Stats. 1921, p. lxxxiii), as amended, known as the California Alien Land Law.

A proceeding of this character has been sanctioned by our court on several occasions and no citation of authorities need be made in this connection. The contract, the subject of the action, is made an exhibit to the complaint and plaintiffs assert that it is not a cropping contract within the meaning of our holdings under several well-considered cases and particularly not violative of said statute above referred to as amended in 1923 (Stats. 1923, p. 1020).

The contract in short provides that the land owner furnish certain elements of the cropping process such as water for irrigation, spraying solution, young trees for replanting, horses and their feed, and tools for carrying on the work, including boxes, nails, and packing material. The alien is then "to do and perform, or cause to be done and performed, at his own cost all labor of every kind, nature and description which is herein specifically set forth and which may be necessary in the planting, cultivation and irrigation of said land and in the harvesting, picking, packing and delivering of the crops and products to be grown thereon as aforesaid."

The contract then has the following further significant features:

(1) It neither specifies the hours, days, or season of employment nor is occupancy of the land at all times by the

alien and his employees forbidden, but is on the contrary impliedly essential.

(2) Neither the number or class of employees nor their wages are specified in the contract.

(3) In case any of the work horses furnished are permanently disabled or killed, the alien must pay the value thereof to the owner.

(4) The same covenants exist respecting the loss or theft of farming implements.

(5) The alien is to be personally responsible for any industrial accidents occurring during the term of occupancy.

(6) The alien must at his own expense keep all help employed by him covered with accident and employers' liability insurance.

(7) Lastly, the alien gets one-half the net proceeds resulting from a sale of the products of the land and net profits are defined by specifying the nature of the items of deduction which include horses lost or permanently disabled and loss of implements misplaced or stolen and various other items such as packing material, horsefeed, water charges, repairs, blacksmithing, freight refrigeration, and commission charges.

[1] In short, the contract lets the alien into possession of the land, with complete control of the cultivating, harvesting, handling, and delivery of the crop grown thereon, as an independent contractor or operator, with unlimited discretion as to hours and seasons of labor, the number, class, residence, and wages of his employees, with independent liability for injury and damage to equipment and independent responsibility for industrial accidents, and insurance of all appropriate types is demanded of him. It is clear, therefore, that these covenants make an out-and-out cropping contract and one specifically forbidden by the 1923 amendment to the said Alien Land Act.

In *Terrace* v. *Thompson*, 263 U. S. 197, 221 [68 L. Ed. 255, 44 Sup. Ct. Rep. 15], in construing a law of the state of Washington, similar to our statute, the court said: "In the case before us, the thing forbidden is very different. It is not an opportunity to earn a living in common occupations of the community, but it is the privilege of owning or controlling agricultural land within the State. The quality and allegiance of those who own, occupy and use the

farm lands within its borders are matters of highest importance and affect the safety and power of the State itself.''

[2] Note that the concern of the state does not stop with ownership or control of agricultural lands but extends to occupancy thereof as well. In the same cause the contention that the statute is in conflict with the treaty between the United States and Japan is effectively disposed of by the holding that the treaty does not purport to give nationals of Japan any rights whatsoever respecting agricultural lands and this is broad enough to include occupancy of this class of land. On the authority of that case, the case of *Porterfield* v. *Webb*, 263 U. S. 225, 232 [68 L. Ed. 278, 44 Sup. Ct. Rep. 21], was decided. It involved the very act controlling us in the case at bar and there it was said: "The treaty between the United States and Japan (37 Stat. 1504–1509) does not confer upon Japanese subjects the privilege of acquiring or leasing land for agricultural purposes.''

Concluding, the court further said: "This case is similar to *Terrace* v. *Thompson, supra.* In that case the grounds upon which the Washington Alien Land Law was attacked included those on which the California act is assailed in this case. There the prohibited class was made up of aliens who had not in good faith declared intention to become citizens. The class necessarily includes all ineligible aliens and in addition thereto all eligible aliens who have failed so to declare. In the case now before us the prohibited class includes ineligible aliens only. In the matter of classification, the States have wide discretion. Each has its own problems, depending on circumstances existing there. It is not always practical or desirable that legislation shall be the same in different States. We cannot say that the failure of the California Legislature to extend the prohibited class so as to include eligible aliens who have failed to declare their intention to become citizens of the United States was arbitrary or unreasonable. See *Miller* v. *Wilson*, 236 U. S. 373, 383, 384 [59 L. Ed. 628, L. R. A. 1915F, 829, 35 Sup. Ct. Rep. 342], and cases cited.''

Later, in *Webb* v. *O'Brien*, 263 U. S. 313, 323, 324 [68 L. Ed. 318, 44 Sup. Ct. Rep. 112], the court had before it a California cropping contract, being for all practicable pur-

poses the same kind of a contract as is here involved. The court again said: "As applied to this case, the act may be read thus: 'Ineligible aliens may own or lease houses, manufactories, warehouses and shops, and may lease land for residential and commercial purposes. These things, but no possession or enjoyment of land otherwise, are permitted.'

"The term of the proposed contract, the measure of control and dominion over the land which is necessarily involved in the performance of such a contract, the cropper's right to have housing for himself and to have his employees live on the land, and his obligation to accept one-half the crops as his only return for tilling the land clearly distinguish the arrangement from one of mere employment. . . . The practical result of such contract is that the cropper has use, control and benefit of land for agricultural purposes substantially similar to that granted to a lessee. Conceivably, by the use of such contracts, the population living on and cultivating the farm lands might come to be made up largely of ineligible aliens. The allegiance of the farmers to the State directly affects its strength and safety. *Terrace* v. *Thompson, supra.* We think it within the power of the State to deny to ineligible aliens the privilege so to use agricultural lands within its borders."

In *Porterfield* v. *Webb,* 195 Cal. 71, 82 [231 Pac. 554], this court with all the foregoing cases before it gave the question here involved thorough consideration and, among other things, it clearly distinguished the case of *In re Okahara,* 191 Cal. 353 [216 Pac. 614], and cited with approval the above quotations from *Webb* v. *O'Brien, supra,* saying: "It is apparent that the decision rests largely upon broad principles of national safety and public welfare. Unquestionably the farming of lands by ineligible aliens would give them a use, occupancy, and benefit of agricultural lands which in effect would amount to a deprivation of its use, enjoyment and occupancy by the citizen. Any other theory would be incompatible with the occupation of husbandry. To all practical purposes this would, *pro tanto,* constitute a withdrawal of agricultural lands from the use, occupancy, and benefit of the citizen."

In *Carter* v. *Utley,* 195 Cal. 84 [231 Pac. 559], this holding was reaffirmed. The same question, with slight variation, was again before the court in *Jones* v. *Webb.* 195 Cal.

88 [231 Pac. 560], where the same conclusions were vigorously reasserted.

Still again in *In re Nose*, 195 Cal. 91 [231 Pac. 561], which involved a so-called employment contract with an ineligible alien, which actually fixed the days and hours of labor and a monthly wage, and as "an additional wage" agreed to give for industry and efficiency a certain percentage of the net profits of the crop to be grown and harvested by the alien, the doctrine was reasserted and the law applied to vitiate such contract.

Judgment affirmed.

Curtis, J., Shenk, J., Richards, J., Waste, C. J., Seawell, J., and Langdon, J., concurred.