[Civil No. 3665. Filed March 16, 1936.]

[55 Pac. (2d) 802.]

## N. TAKIGUCHI, Appellant, v. STATE OF ARIZONA, Appellee.

Messrs. Baker & Whitney and Mr. Lawrence L. Howe, for Appellant.

Mr. John L. Sullivan, Attorney General, and Mr. Lloyd J. Andrews, Assistant Attorney General, for the State.

ROSS, J.—The county attorney of Maricopa county in September of 1934 filed in behalf of and in the name of the state, in the superior court of said county, a complaint alleging that the defendant N. Takiguchi, a subject of the Emperor of Japan, had acquired and come into the possession, use, enjoyment and occupancy of seven separate pieces or parcels of agricultural land (describing them) and was cultivating and preparing the same for crops, and praying that he be restrained from such possession, use, enjoyment, occupation and cultivation of the described agricultural lands, or any other agricultural lands in the state.

The reason assigned in the complaint for applying for an injunction is stated as follows: .

"IV. That the defendant, N. Takiguchi, holds no interest in said lands within the knowledge of the County Attorney that is subject to escheat, and that the County Attorney is unable to obtain sufficient evidence of the existence of a conspiracy in the premises to warrant criminal prosecutions, and unless the defendant, N. Takiguchi, is enjoined and restrained, as aforesaid, irreparable damage will be wrought upon the State of Arizona, in that there is no adequate and speedy remedy at law and that it will necessitate a multiplicity of suits."

The defendant demurred to the complaint for want of facts justifying or permitting equitable relief by injunction, and answered that his only connection with the described pieces of land was that he was an em-

ployee of the owners and that he had no interest whatever in the described premises, or any part thereof.

The court heard the evidence and at its conclusion made findings of fact and conclusions of law and entered judgment against defendant as prayed for in the complaint.

The defendant appeals and specifies several errors.

Our alien land law, adopted in 1921 (chapter 29, Regular Session) is practically a rescript of the California alien land law as originally passed in that state. It appears in its revised form as sections 2782–2790, Revised Code of 1928, and we take it, while its language has been changed somewhat, its meaning is unchanged. By section 2782 aliens ineligible to become citizens of the United States are inhibited, unless such alien's country and ours have a treaty permitting it, to acquire, possess, enjoy and transfer real property, or any interest therein in Arizona. The defendant Takiguchi is a native of Japan and under the law ineligible to become a citizen of the United States, and there exists no provision in the treaty between Japan and this country conferring upon Japanese subjects the privilege of acquiring or leasing agricultural land or acquiring any interest therein. *Porterfield* v. *Webb,* 263 U. S. 225, 44 Sup. Ct. 21, 68 L. Ed. 278; *Terrace* v. *Thompson,* 263 U. S. 197, 44 Sup. Ct. 15, 68 L. Ed. 255.

One of the questions raised by defendant is whether injunction may be employed to prevent an ineligible alien from violating the alien land law, when that law itself provides other remedies as adequate or more adequate and speedy than injunction. It is a general rule that the court has no right or power to issue an injunction restraining a party from doing a criminal act, unless the act, if committed, will

injure or destroy property or some property right of the party complaining or will amount to a public nuisance. *State ex rel. La Prade* v. *Smith,* 43 Ariz. 131, 343, 29 Pac. (2d) 718, 92 A. L. R. 168; *State* v. *Johnson,* 26 N. M. 20, 188 Pac. 1109. The facts here do not show a situation for the application of the exception to the rule. It must be admitted that the remedies prescribed in the law are much more efficacious than injunctive relief. The state may take the real property of an ineligible alien, or any interest he may acquire therein, from him by a proceeding to escheat it. Section 2787, *supra.* It may also prosecute an ineligible alien who has conspired with another to effect a transfer of realty, or an interest in realty, to him, criminally and punish him severely. Section 2789, *supra.* And these remedies may be used concurrently.

Injunction never runs against an accomplished fact. It is preventive in its nature. If the defendant has acquired agricultural land or an interest therein, an injunction cannot affect his status as a landowner. The only thing it might do would be to prevent him from enjoying or occupying or cultivating the land, and then only if the evidence shows he has some interest in the land. In other words, evidence justifying an injunction would sustain a judgment of escheat, or a criminal prosecution for conspiracy, or both.

The law was not intended to prevent ineligible aliens from earning a living in the common occupations of the community. If such were its effect, it would run counter to a long line of decisions by the highest court in the land, one of which, often quoted, is *Truax* v. *Raich,* 239 U. S. 33, 36 Sup. Ct. 7, 10, 60 L. Ed. 131, Ann. Cas. 1917B 283, L. R. A. 1916D 545,

which had its origin in Arizona. In that case the court said:

"It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment [14th Amd. to Const. of U. S.] to secure. [Citing cases.] If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words. It is no answer to say, as it is argued, that the act [Laws of Ariz. 1915, Initiative Measure, p. 12] proceeds upon the assumption that 'the employment of aliens, unless restrained, was a peril to the public welfare.' "

Unquestionably the demurrer should have been sustained and the complaint dismissed.

It is perfectly apparent from the record in this case and the two companion cases [*Takehara et al.* v. *State, post,* p. 313, 55 Pac. (2d) 806; *Morimoto et al.* v. *State, post,* p. 312, 55 Pac. (2d) 806] that the county attorney, after investigation, became convinced that the defendant did not own any agricultural land, or any interest in such land, or that if he did he could not prove it, and that he then adopted the proceedings by injunction solely for the purpose of preventing the defendant from working as a farm hand or overseer of farming operations, for that is what the evidence shows the defendant to be.

If he has any interest in agricultural land, the state did not so contend and did not prove it. In affirmance of this statement, we refer to (1) paragraph 4 of the complaint heretofore quoted in this opinion; (2) admission at the trial in *Morimoto et al.* v. *State of Arizona, post,* p. 312, 55 Pac. (2d) 806, wherein Mr. Howe, attorney for defendants (and also attorney for

defendant Takiguchi), addressing his remarks to the attorney for the state, said: "Counsel now avows that he is not proceeding on the theory that the ineligible alien does have any *interest whatsoever in this land.* I ask counsel if that is the statement" (italics ours), to which the latter replied, "That is the statement. It is contained in every complaint that I filed." (This admission, while made in another case, shows on its face that it applies as well to this case); (3) and, finally, the brief filed in this court by the state containing the following admission:

"*According to the evidence* appellant at no time *had* or claimed to have, any interest in any of the crops mentioned in this statement of the case and never *had* or claimed to have any interest in the premises upon which they grew or were to be grown." (Italics ours.)

Cases are tried and disposed of "according to the evidence," and not in disregard of it, or at least we have always thought that to be the correct and proper rule and the one calculated to accomplish justice and right.

█ Nor do we think the findings of fact by the court, or those supported by the evidence, present any stronger case for injunction. Such findings are that defendant "was engaged in doing, or causing to be done, work and labor on agricultural lands in the Salt River Valley," as follows:

In planting, cultivating and caring for to maturity a cantaloupe and lettuce crop upon 74 acres, under contract with one Saiki, an American citizen of Japanese extraction and who held said land as lessee, for $12.50 per acre for cantaloupes and $17.50 per acre for lettuce and 20 cents for each standard crate of cantaloupes cut, field-crated, and delivered at the direction of Saiki, and 25 cents per crate for lettuce

"cut in the field, field-crated and delivered to the shed or sheds as directed."

In planting, cultivating, and caring for to maturity a crop or crops upon 130 acres for Babbitt-Cowden Land Company for $20 per acre.

In planting, cultivating, and caring for to maturity 200 acres to lettuce and carrots, at $20 per acre for lettuce and $15 per acre for carrots, for Richmond-Samuels Company.

For irrigating the land and keeping ditches clean for 160 acres, at a monthly wage of $75, for Ray Cowden, an American citizen and the guardian of the persons and property of the owners of said 160 acres, such owners being the two minor children of the defendant, who were born in this country and are citizens thereof; and 75 cents to $1 per acre for cutting the alfalfa grown thereon and 75 cents to $1 per acre for disking said land.

It was found that defendant employed laborers, at times as many as one hundred, to help him perform his contracts.

It was also found that the average costs to growers of lettuce for cutting, field-crating, and picking and delivering to sheds ranged from 11½ cents to 13 cents per crate.

The evidence is undisputed that in each and all of these arrangements the employer owned the land, furnished water to irrigate the crops and the seed for the planting, and defendant furnished the labor, work animals, and farming implements. Also that defendant had no interest in the crops grown and that his compensation in no way depended upon a successful crop or its market price. He received the compensation stipulated and nothing more. He got no part of the crops. There was no showing that his posses-

sion or occupancy of the lands was other than that of an ordinary laborer.

The court's conclusion of law was that because defendant's remuneration depended "upon the amount of land on which the work and labor was performed and the amount of the production had thereon . . . the transactions . . . resulted in an enjoyment by the defendant Takiguchi of an interest in land." In other words, the court was of the opinion, as we understand it, that if defendant was receiving $20 per acre for planting and cultivating to maturity a crop upon 10 acres and for cutting and crating and delivering the crop 20 cents per crate, he would not enjoy an interest in the land, but if he was paid at the same rate for 500 acres he would enjoy an interest in the land. Under defendant's contract, the more lettuce and cantaloupes grown and harvested the more crates he would be paid for, and to that extent only his compensation depended upon "the amount of the production." But whether he planted and cultivated to maturity one acre or one hundred, or whether he crated fifty crates of cantaloupes or lettuce or one thousand, he was paid at the same rate per acre and crate.

It will be noted that the court's finding, to the effect that the average cost of cutting, field-crating and delivery of lettuce to the sheds was 11½ cents to 13 cents per crate, has reference only to the actual work performed and does not apply to a "packed-out crate." The only definite proof as to what defendant was to do for the 25 cents for harvesting lettuce is contained in a written contract between him and Saiki, in which it is agreed that he shall

"1. . . . skilfully manage and supervise the harvesting said crops during the entire harvesting season; and shall harvest and prepare all such crops for

market, including the packing and delivery of the same as shall be designated by said party of the first part (Saiki), and at his own expense, furnish and hire for the party of the first part all necessary horses, farm machinery, tools and implements.

"2. In consideration of said services the party of the first part will pay to the party of the second part as follows:

"25¢ per one (1) *packed out crate* of lettuce delivered and accepted for marketing." (Italics ours.)

. In the court's finding the elements of supervision and management of the packing and delivery are not mentioned and cutting, packing and delivery to sheds and "packed out crate" are not the same. The latter, as defined by a witness, means "Cutting in the field, putting on the trucks, hauling to the shed, re-packed in ice and put in the car." All the evidence is that the payment of 20 cents per crate of cantaloupes and 25 cents per crate of lettuce is for "packed out crates." There is no evidence to sustain the court's finding of the cost of delivery to order or direction of owner or what the price for same was.

The court's conclusion of law upon its own findings, although incorrect and incomplete, was not justified.

 While the case as presented must necessarily fail, it must not be thought that our law against ineligible aliens owning, possessing and enjoying agricultural lands, or any interest therein, can be ignored or by subterfuge evaded. These alien land laws do not offend any clause or provision of the state or federal Constitutions or violate any treaty obligation or right existing between this country and the Empire of Japan. *Porterfield* v. *Webb,* 195 Cal. 71, 231 Pac. 554. And, as we read the decisions, the words of the agreement between the owner of land and the alien do not determine whether the alien is enjoying an interest in agricultural land, but, rather,

the actual exercise of control, dominion and occupancy determines the question of interest. See *Webb* v. *O'Brien*, 263 U. S. 313, 44 Sup. Ct. 112, 114, 68 L. Ed. 318. Also *Dudley* v. *Lowell*, 201 Cal. 376, 257 Pac. 57; *Carter* v. *Utley*, 195 Cal. 84, 231 Pac. 559; *Jones* v. *Webb*, 195 Cal. 88, 231 Pac. 560; *In re Nose*, 195 Cal. 91, 231 Pac. 561; *Porterfield* v. *Webb, supra.* As is said in *Webb* v. *O'Brien, supra:*

"The term of the proposed contract, the measure of control and dominion over the land which is necessarily involved in the performance of such a contract, the cropper's right to have housing for himself and to have his employees live on the land, and his obligation to accept one-half the crops as his only return for tilling the land, clearly distinguish the arrangement from one of mere employment. . . . The right to make and carry out cropper contracts such as that before us is not safeguarded to ineligible aliens by the Constitution. A denial of it does not deny the ordinary means of earning a livelihood or the right to work for a living. The practical result of such contract is that the cropper has use, control, and benefit of land for agricultural purposes substantially similar to that granted to a lessee. Conceivably, by the use of such contracts, the population living on and cultivating the farm lands might come to be made up largely of ineligible aliens. The allegiance of the farmers to the state directly affects its strength and safety."

The laws passed upon by the above courts are so much like ours that the decisions are and will be very persuasive to this court in any case properly brought before us. Our law has real teeth in it, and persons who violate it may suffer very severe penalties, that is, they may have their lands escheated to the state besides being made to suffer criminal punishment—as much as two years in the state penitentiary or a $5,000 fine, or both.

Because the remedy of injunction was not, under the circumstances, available, and because, if it were, neither the evidence nor the findings of fact support the judgment, the judgment is reversed and the cause remanded, with directions to dismiss the complaint.

LOCKWOOD, C. J., and McALISTER, J., concur.