[L. A. No. 21149. In Bank. Apr. 17, 1952.]

SEI FUJII, Appellant, v. THE STATE OF CALIFORNIA, Respondent.

J. Marion Wright and Owen E. Kupfer for Appellant.

A. L. Wirin, Fred Okrand and Will Maslow, as Amici Curiae on behalf of Appellant.

Fred N. Howser and Edmund G. Brown, Attorneys General, Everett W. Mattoon, Assistant Attorney General, and John F. Hassler, Deputy Attorney General, for Respondent.

Ralph G. Lindstrom and Lindstrom & Bartlett, as Amici Curiae on behalf of Respondent.

GIBSON, C. J.—Plaintiff, an alien Japanese who is ineligible to citizenship under our naturalization laws, appeals from a judgment declaring that certain land purchased by him in 1948 had escheated to the state. There is no treaty between this country and Japan which confers upon plaintiff the right to own land, and the sole question presented on this appeal is the validity of the California Alien Land Law.[1]

## UNITED NATIONS CHARTER

It is first contended that the land law has been invalidated and superseded by the provisions of the United Nations Charter pledging the member nations to promote the observance of human rights and fundamental freedoms without distinction as to race. Plaintiff relies on statements in the preamble and in articles 1, 55 and 56 of the charter.[2]

---

[1]The pertinent portions of the alien land law (1 Deering's Gen. Laws, Act 261), as amended in 1945, are as follows:

"§ 1. All aliens eligible to citizenship under the laws of the United States may acquire, possess, enjoy, use, cultivate, occupy, transfer, transmit and inherit real property, or any interest therein, in this state, and have in whole or in part the beneficial use thereof, in the same manner and to the same extent as citizens of the United States, except as otherwise provided by the laws of this state.

"§ 2. All aliens other than those mentioned in section one of this act may acquire, possess, enjoy, use, cultivate, occupy and transfer real property, or any interest therein, in this state, and have in whole or in part the beneficial use thereof, in the manner and to the extent, and for the purposes prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise. . . .

"§ 7. Any real property hereafter acquired in fee in violation of the provisions of this act by any alien mentioned in Section 2 of this act, . . . shall escheat as of the date of such acquiring, to, and become and remain the property of the state of California. . . .''

[2]The preamble recites that "We the peoples of the United Nations determined . . . to reaffirm faith in fundamental human rights . . . and for these ends . . . to employ international machinery for the promotion of the economic and social advancement of all peoples; have resolved to combine our efforts to accomplish these aims.''

Article 1 states that "The Purposes of the United Nations are: . . . 3. To achieve international co-operation in solving international problems of an economic, social, cultural, or humanitarian character, and in promoting and encouraging respect for human rights and for

It is not disputed that the charter is a treaty, and our federal Constitution provides that treaties made under the authority of the United States are part of the supreme law of the land and that the judges in every state are bound thereby. (U.S. Const., art. VI) ■ A treaty, however, does not automatically supersede local laws which are inconsistent with it unless the treaty provisions are self-executing. In the words of Chief Justice Marshall: A treaty is "to be regarded in courts of justice as equivalent to an act of the Legislature, whenever it operates of itself, without the aid of any legislative provision. But when the terms of the stipulation import a contract—when either of the parties engages to perform a particular act, the treaty addresses itself to the political, not the judicial department; and the Legislature must execute the contract, before it can become a rule for the court." (*Foster* v. *Neilson* (1829), 2 Pet. (U.S.) 253, 314 [7 L.Ed. 415].)[3]

■ In determining whether a treaty is self-executing courts look to the intent of the signatory parties as manifested by the language of the instrument, and, if the instrument is uncertain, recourse may be had to the circumstances surrounding its execution. (See *Foster* v. *Neilson*, 2 Pet. (U.S.) 253, 310-316 [7 L.Ed. 415]; *United States* v. *Perche-*

---

fundamental freedoms for all without distinction as to race, sex, language, or religion . . ."

Articles 55 and 56 appear in chapter IX, entitled "International Economic and Social Cooperation." Article 55 provides: "With a view to the creation of conditions of stability and well-being which are necessary for peaceful and friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples, the United Nations shall promote:

a. higher standards of living, full employment, and conditions of economic and social progress and development;

b. solutions of international economic, social, health, and related problems; and international cultural and educational cooperation; and

c. universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion."

Article 56 provides: "All Members pledge themselves to take joint and separate action in cooperation with the Organization for the achievement of the purposes set forth in Article 55."

[3]In *Foster* v. *Neilson*, certain treaty provisions were held not to be self-executing on the basis of construction of the English version of the document. Subsequently, upon consideration of the Spanish version, the provisions in question were held to be self-executing. (*United States* v. *Percheman*, 7 Pet. (U.S.) 51 [8 L.Ed. 604].) Chief Justice Marshall's language in the Foster case, however, has been quoted with approval in later cases. (*United States* v. *Rauscher*, 119 U.S. 407, 417-418 [7 S.Ct. 234, 239-240, 30 L.Ed. 425]; *Valentine* v. *United States*, 299 U.S. 5, 10 [57 S.Ct. 100, 103, 81 L.Ed. 5].)

*man,* 7 Pet. (U.S.) 51, 58-59 [8 L.Ed. 604] ; *Jones* v. *Meehan,* 175 U.S. 1, 10-23 [20 S.Ct. 1, 5-10, 44 L.Ed. 49] ; *Chew Heong* v. *United States,* 112 U.S. 536, 539-543 [5 S.Ct. 255, 256-258, 28 L.Ed. 770] ; *Cook* v. *United States,* 288 U.S. 102, 119 [53 S.Ct. 305, 311, 77 L.Ed. 641] ; *cf. Nielsen* v. *Johnson,* 279 U.S. 47, 52 [49 S.Ct. 223, 224, 73 L.Ed. 607].)

 In order for a treaty provision to be operative without the aid of implementing legislation and to have the force and effect of a statute, it must appear that the framers of the treaty intended to prescribe a rule that, standing alone, would be enforceable in the courts. (See Head Money Cases [*Edye* v. *Robertson*], 112 U.S. 580, 598 [5 S.Ct. 247, 254, 28 L.Ed. 798] ; *Whitney* v. *Robertson,* 124 U.S. 190, 194 [8 S.Ct. 456, 458, 31 L.Ed. 386] ; *Cook* v. *United States,* 288 U.S. 102, 118-119 [53 S.Ct. 305, 311, 77 L.Ed. 641] ; *Valentine* v. *United States,* 299 U.S. 5, 10 [57 S.Ct. 100, 103, 81 L.Ed. 5] ; *Bacardi Corp.* v. *Domenech,* 311 U.S. 150, 161 [61 S.Ct. 219, 225, 85 L.Ed. 98].)

 It is clear that the provisions of the preamble and of article 1 of the charter which are claimed to be in conflict with the alien land law are not self-executing. They state general purposes and objectives of the United Nations Organization and do not purport to impose legal obligations on the individual member nations or to create rights in private persons. It is equally clear that none of the other provisions relied on by plaintiff is self-executing. Article 55 declares that the United Nations "shall promote . . . universal respect for, and observance of, human rights and fundamental freedoms for all without distinction as to race, sex, language, or religion," and in article 56, the member nations "pledge themselves to take joint and separate action in cooperation with the Organization for the achievement of the purposes set forth in Article 55." Although the member nations have obligated themselves to cooperate with the international organization in promoting respect for, and observance of, human rights, it is plain that it was contemplated that future legislative action by the several nations would be required to accomplish the declared objectives, and there is nothing to indicate that these provisions were intended to become rules of law for the courts of this country upon the ratification of the charter.

The language used in articles 55 and 56 is not the type customarily employed in treaties which have been held to be self-executing and to create rights and duties in indi-

viduals. For example, the treaty involved in *Clark* v. *Allen*, 331 U.S. 503, 507-508 [67 S.Ct. 1431, 1434, 91 L.Ed. 1633, 170 A.L.R. 953], relating to the rights of a national of one country to inherit real property located in another country, specifically provided that "such national shall be allowed a term of three years in which to sell the property . . . and withdraw the proceeds . . ." free from any discriminatory taxation. (See, also, *Hauenstein* v. *Lynham*, 100 U.S. 483, 488-490 [25 L.Ed. 628].) In *Nielsen* v. *Johnson*, 279 U.S. 47, 50 [49 S.Ct. 223, 73 L.Ed. 607], the provision treated as being self-executing was equally definite. There each of the signatory parties agreed that "no higher or other duties, charges, or taxes of any kind, shall be levied" by one country on removal of property therefrom by citizens of the other country "than are or shall be payable in each State, upon the same, when removed by a citizen or subject of such state respectively." In other instances treaty provisions were enforced without implementing legislation where they prescribed in detail the rules governing rights and obligations of individuals or specifically provided that citizens of one nation shall have the same rights while in the other country as are enjoyed by that country's own citizens. (*Bacardi Corp.* v. *Domenech*, [4]311 U.S. 150, 158-159 [61 S.Ct. 219, 224, 85 L.Ed. 98]; *Asakura* v. *Seattle*, 265 U.S. 332, 340 [44 S.Ct. 515, 516, 68 L.Ed. 1041]; see *Maiorano* ·v. *Baltimore & Ohio R.R. Co.*, 213 U.S. 268, 273-274 [29 S.Ct. 424, 425-426, 53 L.Ed. 792]; *Chew Heong* v. *United States*, 112 U.S. 536, 541-542 [5 S.Ct. 255, 257, 28 L.Ed. 770].)

It is significant to note that when the framers of the charter intended to make certain provisions effective without the aid of implementing legislation they employed language which is clear and definite and manifests that intention. For example, article 104 provides: "The Organization shall enjoy in the territory of each of its Members such legal capacity as may be necessary for the exercise of its functions and the fulfillment of its purposes." Article 105 provides: "1. The Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfillment of its purposes. 2. Representatives of the

---

[4]It should be noted, however, that the treaty involved in the Bacardi case also contained a specific provision, not discussed by the court, that its terms "shall have the force of law in those States in which international treaties possess that character, as soon as they are ratified by their constitutional organs." (311 U.S. 150, 159 [61 S.Ct. 219, 224, 85 L.Ed. 98].)

Members of the United Nations and officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization.'' In *Curran* v. *City of New York*, 77 N.Y.S.2d 206, 212, these articles were treated as being self-executory. (See, also, *Balfour, Guthrie & Co.* v. *United States*, 90 F.Supp. 831, 832.)

The provisions in the charter pledging cooperation in promoting observance of fundamental freedoms lack the mandatory quality and definiteness which would indicate an intent to create justiciable rights in private persons immediately upon ratification. Instead, they are framed as a promise of future action by the member nations. Secretary of State Stettinius, chairman of the United States delegation at the San Francisco Conference where the charter was drafted, stated in his report to President Truman that article 56 ''pledges the various countries to cooperate with the organization by joint and separate action in the achievement of the economic and social objectives of the organization without infringing upon their right to order their national affairs according to their own best ability, in their own way, and in accordance with their own political and economic institutions and processes.'' (Report to the President on the Results of the San Francisco Conference by the Chairman of the United States Delegation, the Secretary of State, Department of State Publication 2349, Conference Series 71, p. 115; Hearings before the Committee on Foreign Relations, United States Senate [Revised] July 9-13, 1945, p. 106.) The same view was repeatedly expressed by delegates of other nations in the debates attending the drafting of article 56. (See U.N.C.I.O. Doc. 699, II/3/40, May 30, 1945, pp. 1-3; U.N.C.I.O. Doc. 684, II/3/38, May 29, 1945, p. 4; Kelsen, The Law of the United Nations [1950], footnote 9, pp. 100-102.)

The humane and enlightened objectives of the United Nations Charter are, of course, entitled to respectful consideration by the courts and legislatures of every member nation, since that document expresses the universal desire of thinking men for peace and for equality of rights and opportunities. The charter represents a moral commitment of foremost importance, and we must not permit the spirit of our pledge to be compromised or disparaged in either our domestic or foreign affairs. ■ We are satisfied, however, that the charter provisions relied on by plaintiff were not

intended to supersede existing domestic legislation, and we cannot hold that they operate to invalidate the Alien Land Law.

#### FOURTEENTH AMENDMENT OF THE FEDERAL CONSTITUTION

■ The next question is whether the Alien Land Law violates the due process and equal protection clauses of the Fourteenth Amendment. Plaintiff asserts, first, that the statutory classification of aliens on the basis of eligibility to citizenship is arbitrary for the reason that discrimination against an ineligible alien bears no reasonable relationship to promotion of the safety and welfare of the state. He points out that the land law distinguishes not between citizens and aliens, but between classes of aliens, and that persons eligible to citizenship are given all the rights of citizens regardless of whether they desire or intend to become naturalized. Secondly, he contends that the effect of the statute, as well as its purpose, is to discriminate against aliens solely on the basis of race and that such discrimination is arbitrary and unreasonable.

The issue of the constitutionality of the Alien Land Law is thus again presented to this court,[5] and we are met at the outset with the contention that a re-examination of the question is foreclosed by decisions of the United States Supreme Court rendered in 1923 upholding the statute. (*Porterfield* v. *Webb*, 263 U.S. 225 [44 S.Ct. 21, 68 L.Ed 278]; *Webb* v. *O'Brien*, 263 U.S. 313 [44 S.Ct. 112, 68 L.Ed. 318]; *Frick* v. *Webb*, 263 U.S. 326 [44 S.Ct. 115, 68 L.Ed. 323]; *cf. Terrace* v. *Thompson*, 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255]. See, also, *Cockrill* v. *California* (1925), 268 U.S. 258 [45 S.Ct. 490, 69 L.Ed 944].) This objection is a serious one, and we have rejected it only after the most careful deliberation.

In 1946, this court applied the rule of *Porterfield* v. *Webb*, 263 U.S. 225 [44 S.Ct. 21, 68 L.Ed. 278], in the case of *People* v. *Oyama*, 29 Cal.2d 164 [173 P.2d 794], and in the following year, in *Takahashi* v. *Fish & Game Com.*, 30 Cal.2d

---

[5]See, for example, *Porterfield* v. *Webb* (1924), 195 Cal. 71 [231 P. 554]; *Mott* v. *Cline* (1927), 200 Cal. 434 [253 P. 718]; *Dudley* v. *Lowell* (1927), 201 Cal. 376 [257 P. 57]; *People* v. *Osaki* (1930), 209 Cal. 169 [286 P. 1025]; *People* v. *Morrison* (1932), 125 Cal.App. 282 [13 P.2d 800] (hearing denied); *Alfafara* v. *Fross* (1945), 26 Cal. 2d 358 [159 P.2d 14]; *People* v. *Oyama* (1946), 29 Cal.2d 164 [173 P.2d 794]; *cf. Takahashi* v. *Fish & Game Com.* (1947), 30 Cal.2d 719 [185 P.2d 805] (involving legislation prohibiting issuance of commercial fishing licenses to aliens ineligible to citizenship).

719 [185 P.2d 805], it upheld other legislation which classified aliens on the basis of eligibility to citizenship. Both judgments were reversed upon certiorari in 1948. (*Oyama* v. *California*, 332 U.S. 633 [68 S.Ct. 269, 92 L.Ed. 249]; *Takahashi* v. *Fish & Game Com.*, 334 U.S. 410 [68 S.Ct. 1138, 92 L.Ed. 1478].) These and other recent decisions of the United States Supreme Court, which we shall discuss later, state and apply concepts of rights under the Fourteenth Amendment that are at variance with the opinions in the earlier cases.

The holding of the United States Supreme Court in the Oyama case was that a presumption declared by section 9 of the alien land law[6] violated the rights of citizens who were children of ineligible aliens and discriminated against such citizens solely because of their parents' ancestry. The court was also confronted with the claim that the general provisions of the land law denied ineligible aliens the equal protection of the laws, and it is significant that the contention was not discussed by the majority opinion although it could easily have been disposed of by citation of *Porterfield* v. *Webb* had there been no question in the minds of the members of the court with respect to the correctness of that decision. In rejecting an argument that the presumption was necessary to prevent evasion of the prohibition against ownership of land by ineligible aliens, the court speaking through Chief Justice Vinson said, "This reasoning presupposes the validity of that prohibition, a premise which we deem it unnecessary and therefore inappropriate to re-examine in this case. But assuming, for purposes of argument only, that the basic prohibition is constitutional, it does not follow that there is no constitutional limit to the means which may be used to enforce it." (332 U.S. at p. 646, 68 S.Ct. at p. 275; see, also, footnote 27 to majority opinion.) Four justices concurred in the result on the broad ground that the basic provisions of the alien land law violate the Fourteenth Amendment, stating that previous decisions upholding the statute should be overruled.

*Takahashi* v. *Fish & Game Com.*, 334 U.S. 410 [68 S.Ct. 1138, 92 L.Ed. 1478], gives further indication that the Porterfield decision is no longer to be regarded as settled law. In

---

[6]This section provides for a prima facie presumption of intent to evade escheat upon proof that the consideration for a conveyance of realty was paid or agreed to be paid by an ineligible alien and that title was taken in the name of a citizen or eligible alien.

the Takahashi case a California statute which denied commercial fishing licenses to "aliens ineligible for citizenship" was invalidated on the ground that it violated the equal protection clause and conflicted with federal·immigration power when it prevented ineligible aliens from earning a living as fishermen. In answer to arguments relying by analogy on *Porterfield* v. *Webb* and similar cases, the court said: "Assuming the continued validity of those cases, we think they could not in any event be controlling here." (334 U.S. at p. 422, 68 S.Ct. at p. 1144.) There was thus another intimation that the court might not regard those decisions as binding authority if the constitutionality of the alien land laws were again squarely presented for determination.

Our view that we are not precluded from re-examining the question is reinforced by the recent case of *Kenji Namba* v. *McCourt* (1949), 185 Ore. 579 [204 P.2d 569], where the Supreme Court of Oregon, in holding invalid the alien land law of that state, reviewed the opinions of the United States Supreme Court and concluded that the Porterfield and related cases had been disapproved by *Oyama* v. *California*, 332 U.S. 633 [68 S.Ct. 269, 92 L.Ed. 249], and *Takahashi* v. *Fish & Game Com.*, 334 U.S. 410 [68 S.Ct. 1138, 92 L.Ed. 1478].

It thus appears .that the decisions of the United States Supreme Court do not foreclose, but rather invite, further consideration of the constitutional issues which have been raised.

The leading case involving alien land legislation, *Terrace* v. *Thompson*, 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255], upheld a Washington law prohibiting landholding by any alien who had failed to file a declaration of intention to become an American citizen. While that statute did not mention eligibility for naturalization, the court noted that a class composed of nondeclarant aliens necessarily included all ineligible aliens, and it concluded that discrimination between aliens on the basis of ineligibility to citizenship did not violate the equal protection clause. The following reasons were given in support of the decision: (1) "Two classes of aliens inevitably result from the naturalization laws,—those who may and those who may not become citizens. The rule established by Congress on this subject, in and of itself, furnishes a reasonable basis for classification in a state law withholding from aliens the privilege of land ownership . . ." (2) "It is obvious that one who is not a citizen and cannot

become one lacks an interest in, and the power to effectually work for the welfare of, the state, and, so lacking, the state may rightfully deny him the right to own and lease real estate within its boundaries.'' (3) ''If one incapable of citizenship may lease or own real estate, it is within the realm of possibility that every foot of land within the state might pass to the ownership or possession of noncitizens.'' It was also said that the ''quality and allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the State itself.'' (263 U.S. at pp. 220-221, 44 S.Ct. at p. 20.)

*Porterfield* v. *Webb*, 263 U.S. 225 [44 S.Ct. 21, 68 L.Ed. 278], upholding the constitutionality of the California alien land law, was decided the same day as *Terrace* v. *Thompson* and was held to be controlled by that decision. The court, in a short opinion, reasoned as follows: The prohibited class under the Washington law consisted of nondeclarant aliens; this necessarily included all aliens ineligible for citizenship, which was the prohibited class defined by the California act; and the failure of California to extend the prohibition to eligible aliens who failed to declare their intent to become citizens could not be said to be arbitrary or unreasonable.

The foregoing summary covers all the grounds upon which our alien land law has heretofore been upheld by the United States Supreme Court. As we shall see, *Porterfield* v. *Webb*, 263 U.S. 225 [44 S.Ct. 21, 68 L.Ed. 278], has been greatly weakened by subsequent decisions, and it is settled that the authority of an older case may be as effectively dissipated by a later trend of decision as by a statement expressly overruling it. (See, for example, *Olsen* v. *Nebraska*, 313 U.S. 236, 244-246 [61 S.Ct. 862, 864-865, 85 L.Ed. 1305, 133 A.L.R. 1500].) Constitutional principles declared in recent years are irreconcilable with the reasoning of the earlier cases and lead us to conclude that the statute violates the equal protection clause of the Fourteenth Amendment.

There can be no question that the rights to acquire, enjoy, own and dispose of property are ''among the civil rights intended to be protected from discriminatory state action by the Fourteenth Amendment,'' and that the power of a state to regulate the use and ownership of land must be exercised subject to the controls and limitations of that amendment. (*Shelley* v. *Kraemer*, 334 U.S. 1, 10 [68 S.Ct. 836, 841, 92 L.Ed. 1161, 3 A.L.R.2d 441]; see *Terrace* v.

*Thompson, supra,* 263 U.S. 197, 218 [44 S.Ct. 15, 19, 68 L.Ed. 255].)

The California act, in the absence of treaty, withholds all interests in real property from aliens who are ineligible to citizenship under federal naturalization laws, and the Nationality Code limits the right of naturalization to certain designated races or nationalities, excluding Japanese and a few racial groups comparatively small in numbers. (8 U.S.C.A. § 703.) Congress, however, at least prior to 1924,[7] saw fit to permit aliens who are ineligible for citizenship to enter and reside in the United States despite the fact that they could not become naturalized, and such aliens are entitled to the same protection as citizens from arbitrary discrimination. (*Yick Wo* v. *Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220]; *Truax* v. *Raich,* 239 U.S. 33 [36 S.Ct. 7, 60 L.Ed. 131].) Accordingly, the statute cannot be sustained unless it can be shown that the public interest requires limitation of their rights to acquire and enjoy interests in real property.

By its terms the land law classifies persons on the basis of eligibility to citizenship, but in fact it classifies on the basis of race or nationality. This is a necessary consequence of the use of the express racial qualifications found in the federal code. Although Japanese are not singled out by name for discriminatory treatment in the land law, the reference therein to federal standards for naturalization which exclude Japanese operates automatically to bring about that result.[8] This was recognized in *Oyama* v. *California, supra,* 332 U.S. 633, 640, 644 [68 S.Ct. 269, 272, 274, 92 L.Ed. 249], where Chief Justice Vinson, speaking for a majority of the court, concluded that the alien land law as applied in that case discriminated against a Japanese-American citizen, and that the ''only basis for this discrimination . . . was the fact that his father was Japanese and not American, Russian, Chinese, or English.'' It was on this ground that the court invalidated a presumption contained in the California land law, stating that ''only the most exceptional circumstances can excuse discrimination on that basis in the face of the

---

[7]For all practical purposes, immigration of ineligible aliens was halted by the Exclusion Act of 1924. (8 U.S.C.A. § 213c.)

[8]Compare legislative devices to deprive Negroes of franchise without express mention of race. See *Guinn* v. *United States,* 238 U.S. 347 [35 S.Ct. 926, 59 L.Ed. 1340]; *Lane* v. *Wilson,* 307 U.S. 268 [59 S.Ct. 872, 83 L.Ed. 1281]; *Smith* v. *Allwright,* 321 U.S. 649 [64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110].

equal protection clause.'' (332 U.S. at p. 646, 68 S.Ct. at p. 275.)

Subsequent to the Oyama case the Supreme Court condemned the enforcement by state courts of covenants which restrict occupancy of real property on the basis of race or color, and it expressly pointed out that statutes incorporating such restrictions would violate the Fourteenth Amendment. (*Shelley* v. *Kraemer,* 334 U.S. 1, 11 [68 S.Ct. 836, 841, 92 L.Ed. 1161, 3 A.L.R.2d 441].) While the persons discriminated against in the Shelley and Oyama cases were citizens, it is clear, as we have seen, that the Fourteenth Amendment protects aliens as well as citizens from arbitrary discrimination. (*Yick Wo* v. *Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220]; *Truax* v. *Raich,* 239 U.S. 33 [36 S.Ct. 7, 60 L.Ed. 131].)

■ As a general rule a legislative classification will be sustained if it is reasonable and has a substantial relation to a legitimate object, and the existence of any reasonably conceivable state of facts sufficient to uphold the legislation will be presumed. (*Lelande* v. *Lowery,* 26 Cal.2d 224, 232 [157 P.2d 639, 175 A.L.R. 1109]; *Sacramento M. U. Dist.* v. *Pacific Gas & Elec. Co.,* 20 Cal.2d 684, 693 [128 P.2d 529].)

■ Where, however, as here, the classification is on the basis of race, it is ''immediately suspect'' and will be subjected ''to the most rigid scrutiny.'' (*Korematsu* v. *United States,* 323 U.S. 214, 216 [65 S.Ct. 193, 194, 89 L.Ed. 194].) In *Perez* v. *Sharp,* 32 Cal.2d 711, 719 [198 P.2d 17], Justice Traynor pointed out that ''Race restrictions must be viewed with great suspicion, for the Fourteenth Amendment 'was adopted to prevent state legislation designed to discriminate on the basis of race or color' (*Railway Mail Ass'n* v. *Corsi,* 326 U.S. 88, 94 [65 S.Ct. 1483, 89 L.Ed. 2072]; *Williams* v. *International Brotherhood of Boilermakers,* 27 Cal.2d 586, 590 [165 P.2d 903]) and expresses 'a definite national policy against discrimination because of race or color.' (*James* v. *Marinship Corp.,* 25 Cal.2d 721, 740 [155 P.2d 329, 160 A.L.R. 900].) Any state legislation discriminating against persons on the basis of race or color has to overcome the strong presumption inherent in this constitutional policy.'' (See also *Shelley* v. *Kraemer,* 334 U.S. 1, 23 [68 S.Ct. 836, 847, 92 L.Ed. 1161, 3 A.L.R.2d 441], for discussion of purpose of Fourteenth Amendment with regard to race and color.)

The clear import of the statements quoted above from

the Korematsu, Oyama and Perez cases is that the presumption of validity is greatly narrowed in scope, if not entirely dispelled, whenever it is shown, as here, that legislation actually discriminates against certain persons because of their race or nationality. This view, now established by the latest declarations of the United States Supreme Court, is irreconcilable with the approach previously taken by that court in the Porterfield case in determining whether there was a reasonable relation between the purposes sought to be accomplished, and the classification adopted, in the California Alien Land Law.

The opinion of Justice Butler in the Porterfield case overlooked the fact that the classification resulted in racial discrimination, and it did not consider the validity of the California law in the light of the present rule that restrictive measures which curtail the rights of a racial group must be carefully scrutinized. As noted above, that decision was based upon the authority and reasoning of *Terrace* v. *Thompson, supra,* 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255], which involved a statute classifying aliens on the basis of whether or not they had filed a declaration of intention to become citizens. The court there rejected a contention that such classification discriminated because of race or color by pointing out that under the terms of the statute all nondeclarant aliens, of whatever race or color, were prohibited from owning land. The statement is obviously inapplicable to the California statute, and the Porterfield case is entirely silent on the question whether race discrimination is implicit in the method of classification adopted in California. Accordingly, it devolves upon us to examine with care the reasons which have heretofore been advanced in support of alien land legislation.

One of the most persistent arguments popularly advanced in support of the validity of the restrictive provisions of the Alien Land Law is that the statute merely carries into effect a legislative policy of Congress and that the regulations established by federal law, as to who may and may not become citizens, in themselves furnish a reasonable basis for classification. This view has the effect of evading every other legal attack on the statute, for it concedes that the state law is discriminatory and shifts the blame to the federal immigration law which was enacted under the plenary power of Congress over immigration and naturalization free from the inhibitions of the Fourteenth Amendment. The

argument also conveys the suggestion that the courts need not seriously concern themselves with this particular denial of fundamental rights, since Congress in due time may change its immigration policy so as to render the alien land law a dead letter.

The fallacy in the contention that the California statute merely carries a congressional policy into effect appears from a cursory examination of the two totally distinct types of legislation. Congress has enacted a naturalization law, not a property law. Congress regulates admission to citizenship, not ownership of property. Congress has neither declared nor assumed that landowners ineligible to citizenship are a danger to the state; our Legislature has so declared or assumed. The purposes and factual assumptions of the alien land law all originate in our own legislation, without direction or even suggestion from Congress. It may be noted in passing that only a small minority of states have such alien legislation, although the same immigration regulations apply throughout the country. (See 5 Vernier, American Family Laws [1938], 304-346; McGovney, *The Anti-Japanese Land Laws* [1947], 35 Cal.L.Rev. at pp. 21-24.)

The view that federal naturalization classifications are automatically proper for purposes of state legislation was specifically rejected in *Takahashi* v. *Fish & Game Com.*, 334 U.S. 410, 420 [68 S.Ct. 1138, 1143, 92 L.Ed. 1478]. It was there pointed out by Justice Black, speaking for a majority of the court, that the power of Congress to put racial groups in special classifications for purposes of regulating immigration and naturalization is very broad and wholly distinguishable from the power of the state to discriminate between such groups in determining which of its residents shall have the right to acquire, enjoy, own, and dispose of property. Accordingly, if a state wishes to borrow a federal system of grouping, it must justify the adopted classification in its new setting, and the state's use of the distinction must stand or fall on its own merits.

The state asserts that the purpose of the alien land law is to restrict the use and ownership of land to persons who are loyal and have an interest in the welfare of the state. As we shall see later, this is not the true objective of the legislation, but even if it were there is no reasonable relationship between that asserted purpose and the classification on the basis of eligibility to citizenship. Just as eligibility to citizenship does not automatically engender loyalty or

create an interest in the welfare of the country, so ineligibility does not establish a lack of loyalty or the absence of interest in the welfare of the country. Nor does it follow that a person has no stake in the economic and social fortune of a state merely because the federal law denies him the right to naturalization. His American-born children are citizens, and, having made his home here, he has a natural interest, identical with that of an eligible alien, in the strength and security of the country in which he makes a living for his family and educates his children.

In determining the propriety of a classification on the basis of ineligibility to citizenship, consideration must necessarily be given to the nature of the requirements for naturalization. The Nationality Code sets forth a number of conditions in addition to racial qualifications; for example, a person is ineligible to become a citizen who cannot speak English, or does not believe in our form of government and in property rights, or has been convicted of desertion from the armed forces or evasion of the draft during war, or has not resided in the United States for a prescribed time, or is not of good moral character. (See 8 U.S.C.A. § 704 et seq.) It may be that some of these requirements for naturalization bear a reasonable relationship to the asserted purpose of singling out a class of persons who are not loyal to this country or interested in its welfare. Other requirements, however, and particularly the provisions regarding race, obviously do not constitute an accurate or reasonable method for distinguishing between loyal and disloyal persons. Likewise, even if it be assumed that there might be some justification for a statute denying rights in property to aliens who can become citizens, but who have not displayed sufficient interest in this country to seek naturalization, there can be no justification for a classification which operates to withhold property rights from some aliens, not because of anything they have done or any beliefs they hold, but solely because they are Japanese and not French or Italian. The only disqualification urged against Sei Fujii is that of race, but it may be said of him as it was said of Kumezo Kawato, "Nothing in this record indicates, and we cannot assume, that he came to America for any purpose different from that which prompted millions of others to seek our shores—a chance to make his home and work in a free country, governed by just laws, which promise equal protection

to all who abide by them." (*Ex parte Kawato*, 317 U.S. 69, 71 [63 S.Ct. 115, 117, 87 L.Ed. 58].)

One of the grounds given for the decision in *Terrace* v. *Thompson*, 263 U.S. 197, 220-221 [44 S.Ct. 15, 20, 68 L.Ed. 255], was that it was within the "realm of possibility" that all the real property in a state might pass to the ownership or possession of persons ineligible to citizenship in the absence of restrictive legislation. Whatever justification there may have been for fear of this sort in 1923, any basis for such apprehension is now entirely lacking. Changes in the naturalization and immigration laws since the Terrace and Porterfield decisions, together with other factors, have reduced that possibility to the vanishing point. (See concurring opinion of Justice Murphy, in *Oyama* v. *California*, 332 U.S. 633, 667-669 [68 S.Ct. 269 at pp. 285-286, 92 L.Ed. 249].) When those cases were decided, only white persons and persons of African nativity and descent were eligible to become citizens. (Naturalization Act of 1790; 18 Stats. 318 [1875].) At the time the present proceeding was begun, in 1949, the naturalization laws had been amended to provide that the following may become citizens: "descendants of races indigenous to the western hemisphere" (8 U.S.C.A. § 703; 54 Stats. 1140, ch. 876 [1940]); "any person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States" (8 U.S.C.A. § 1001; 56 Stats. 182 [1942]); Chinese persons and persons of Chinese descent (8 U.S.C.A. § 703; 57 Stats. 601 [1943]); Filipinos and persons indigenous to India (8 U.S.C.A. § 703; 60 Stats. 416 [1946]). Thus, in 1949, the California alien land law could operate only against Japanese and a small number of residents of a few other races, such as Polynesians. According to 1940 census figures, the alien Japanese population of California was 33,569. Immigration of persons ineligible to citizenship was halted by the Exclusion Act of 1924 (43 Stats. 161, 8 U.S.C.A. § 213c), hence Japanese aliens in the state in 1949 were necessarily of mature years, and their number must have been materially less than in 1940 due to death, changes of residence, deportation and other causes.

Moreover, if, as indicated in the Terrace case (263 U.S. at pp. 217-221, 44 S.Ct. at pp. 18-20), a state may properly bar all noncitizens from owning land, the method of classification here involved was not designed to bring about that result. The California statute leaves in possession and con-

trol of land many eligible aliens who have never declared their intention to seek naturalization and who have been residents for so long a time without becoming declarants that one may infer a settled purpose on their part never to become citizens.

In the foregoing discussion, we have assumed, as asserted by the attorney general, that the purpose of the alien land law is to limit the use and ownership of land to those who are loyal to this country and have an interest in the welfare of this state. It is generally recognized, however, that the real purpose of the legislation was the elimination of competition by alien Japanese in farming California land. The argument presented in favor of adoption of the act in the 1920 voters pamphlet stated that the statute's "primary purpose is to prohibit Orientals who cannot become American citizens from controlling our rich agricultural lands," that "Orientals, largely Japanese, are fast securing control of the richest irrigated lands in the state," and that "control of these rich lands means in time control of the products and control of the markets." A former attorney general of California declared that the basis of the alien land law legislation was "race undesirability" and that "It was the purpose of those who understood the situation to prohibit the enjoyment or possession of, or dominion over, the agricultural lands of the State by aliens ineligible to citizenship, —in a practical way to prevent ruinous competition by the Oriental farmer against the American farmer." (See Ferguson, *California Alien Land Law* [1947] 35 Cal.L.Rev. 61, 68; McGovney, *Anti-Japanese Land Laws* [1947] 35 Cal.L. Rev. 7, 14, 49; State Board of Control report, "California and the Oriental" [1920 ed.] pp. 8-9, 45, 49-52.) Shortly after the statute was enacted this court recognized that the legislation was directed at the Japanese and that its purpose was to discourage them from coming into this state. (*Estate of Yano,* 188 Cal. 645 [206 P. 995].) Moreover, the state has enforced the law solely against persons ineligible to citizenship because of race and primarily against Japanese. (See statistics collected in concurring opinion by Justice Murphy in *Oyama* v. *California,* 332 U.S. 633, 661-662 [68 S.Ct. 269, 283, 92 L.Ed. 249]; Ferguson, *California Alien Land Law* [1947] 35 Cal.L.Rev. at pp. 61, 73.) Although the prevention of agricultural competition between residents of the state might be a proper legislative objective under some circumstances, arbitrary or unreasonable means

may not be used to accomplish that result, and discrimination on the basis of race, whether by the terms of a statute or the manner of its administration, is obviously contrary to the Fourteenth Amendment.

It is well established that all aliens lawfully in this country have a right "to work for a living in the common occupations of the community." (*Truax* v. *Raich,* 239 U.S. 33 [36 S.Ct. 7, 60 L.Ed. 131] ; *Takahashi* v. *Fish & Game Com.,* 334 U.S. 410 [68 S.Ct. 1138, 92 L.Ed. 1478].) Much emphasis has been placed in argument on an asserted distinction between the right to engage in common callings and the right to own or use real property, but an examination of the authorities shows that the distinction had its roots and justification solely in the ancient common law system of feudal tenure,[9] and it has no rational basis today. As pointed out above, the United States Supreme Court, in *Takahashi* v. *Fish & Game Com.,* 334 U.S. 410 [68 S.Ct. 1138, 92 L.Ed. 1478], held that a California code provision denying commercial fishing licenses to persons "ineligible to citizenship" violated the equal protection clause and conflicted with the federal power to regulate immigration. It was assumed for the purposes of the Takahashi decision that one objective of the licensing law was "to protect California citizens engaged in commercial fishing from competition with Japanese aliens." The opinion necessarily determined that such a purpose did not justify discrimination against persons ineligible to citizenship. If there is no constitutional basis for such discrimination in regard to work in "ordinary

---

[9]See McGovney, *Anti-Japanese Land Laws* [1947], 35 Cal.L.Rev. 7, 18-20, 39-41.

At early common law an alien could acquire real property by gift, purchase or devise, but his rights in the property were subject to forfeiture by the crown. The historical basis for this disability has been traced to fear that the safety of the English crown was threatened by the large number of Normans and Frenchmen owning English land in the thirteenth century. (See Pollack and Maitland, History of English Law [2d ed., 1898] 463; 9 Holdsworth, History of English Law [1926] 92-93.) Early commentators offered such explanations for the rule as the fact that aliens, owing a foreign allegiance, were regarded as incapable of performing military service for the king, one of the most important incidents of the feudal tenure system. (See 2 Blackstone Comm. 250; *State* v. *Boston, C. & M.R.R. Co.,* 25 Vt. 433, 438.) Further, in time of war aliens "might fortify themselves in the heart of the realm" and, in time of peace, so much of the freehold land might be held by aliens that there would not be enough English freeholders to man the juries and hence "there should follow a failure of justice." (Calvin's Case [1609] 77 Eng.Rep. 377.) France and England abolished discrimination against aliens with regard to property rights in 1819 and 1870, respectively.

occupations," such as commercial fishing, in what way does the identical type of discrimination become valid where the work involves, as an incident, the ownership or possession of real property?

The truth is that the right to earn a living in many occupations is inseparably connected with the use and enjoyment of land. Farming, for example, is one of the most ancient and common ways of making a living, but the rule of the Porterfield case permits a state, in the absence of treaty, to so restrict an ineligible alien resident that he can farm land only in the capacity of an employee or hired hand. (See *Webb* v. *O'Brien*, 263 U.S. 313 [44 S.Ct. 112, 68 L.Ed. 318]; *Frick* v. *Webb*, 263 U.S. 326 [44 S.Ct. 115, 68 L.Ed. 323].) Moreover, under the Porterfield rule, ineligible aliens who are not protected by treaty may be restricted in following many ordinary occupations other than farming, since it is reasonably necessary to the operation of most private businesses to own or lease land upon which an office, shop or factory may be located.[10] Legislation which results in such discrimination imposes upon the ineligible alien an economic status inferior to that of all other persons living in the state and interferes with his right to earn a living. (See *Kenji Namba* v. *McCourt*, 185 Ore. 579 [204 P.2d 569, 583]; concurring opinion, *Palermo* v. *Stockton Theatres, Inc.*, 32 Cal.2d 53, 66-67 [195 P.2d 1].) As the Supreme Court of Oregon recently said, in declaring invalid an alien land law substantially the same as the California statute, "Our country cannot afford to create, by legislation or judicial construction, a ghetto for our ineligible aliens. And yet if we deny to the alien who is lawfully here the normal means whereby he earns his livelihood, we thereby assign him to a lowered standard of living." (*Kenji Namba* v. *McCourt, supra*, 204 P.2d at p. 583.)

In the light of the foregoing discussion, we have concluded that the constitutional theories upon which the Porterfield case was based are today without support and must be abandoned. ■■■ The California Alien Land Law is obviously designed and administered as an instrument for ef-

---

[10]When the alien land law was enacted a treaty permitted alien Japanese to lease commercial and residential property. This treaty was subsequently abrogated, but the statute was construed as having incorporated the treaty provisions and as permitting such leases. (*Palermo* v. *Stockton Theatres, Inc.*, 32 Cal.2d 53 [195 P.2d 1].)

fectuating racial discrimination, and the most searching examination discloses no circumstances justifying classification on that basis. There is nothing to indicate that those alien residents who are racially ineligible for citizenship possess characteristics which are dangerous to the legitimate interests of the state, or that they, as a class, might use the land for purposes injurious to public morals, safety or welfare. Accordingly, we hold that the alien land law is invalid as in violation of the Fourteenth Amendment.

The judgment is reversed.

Edmonds, J., and Traynor, J., concurred.

CARTER, J.—I concur in the judgment of reversal.

The sole justification of the statute barring Japanese aliens from owning or occupying property in California is that such persons will not be legal citizens familiar with American concepts and will use the property to the detriment, rather than the welfare, of the nation. Authority for that conclusion is a similar statement made by Mr. Justice Butler in *Terrace* v. *Thompson,* 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255], in 1923, who, in turn, took it from the decision of the judge in the lower court. There was not then, much less now, any basis for it. Regardless of what may have been the popular concept when our present immigration, naturalization and alien land laws were adopted and upheld by our courts, the trend of thought influenced by subsequent events is diametrically opposed to the philosophy underlying those laws and the decisions upholding them. The basic fallacy of the argument advanced in support of the validity of the alien land laws is in making ineligibility for citizenship the postulate of the classification of persons who are prohibited from owning land.

Mr. Justice Schauer, in his dissenting opinion, charges the majority of this court with refusal to perform its judicial duty by the rendition of its decision declaring the California Alien Land Law unconstitutional. Our decision, he says, stems "from the strong social views of the justices who write it and from their desire to make the law what they think it should be," and is based on the conjecture that the Supreme Court of the United States "which has previously upheld the law may eventually reverse itself."

For my part in participating in the decision, I deny the charge. I have always considered that the decisions uphold-

ing the alien land laws were based upon a false premise and that those laws were never valid because they contravened constitutional mandates. I did not join with the majority of this court in *People* v. *Oyama*, 29 Cal.2d 164 [173 P.2d 794], which was reversed by the Supreme Court of the United States (see *Oyama* v. *California*, 332 U.S. 633 [68 S.Ct. 269, 92 L.Ed. 249]), and I dissented in *Takahashi* v. *Fish & Game Com.*, 30 Cal.2d 719 [185 P.2d 805], which was likewise reversed by the Supreme Court of the United States (see *Takahashi* v. *Fish & Game Com.*, 334 U.S. 410 [68 S.Ct. 1138, 92 L.Ed. 1478]). I took the position when those cases were before this court that the statutes there involved violated constitutional mandates and should be stricken down. I took this position without regard to the conclusion which might finally be reached by the Supreme Court of the United States. While the majority of the Supreme Court of California upheld the statutes involved in those cases, its decisions were reversed by the Supreme Court of the United States. I can see no distinction in the disposition of those cases by this court and the case at bar. In my opinion this court has the right to say at this time that the statute here involved is unconstitutional even though the former decisions of the Supreme Court of the United States appear to have upheld it as constitutional. What conclusion that court may ultimately reach in this particular case cannot change my view with respect to what the decision of this court should be. I am fully cognizant that this position may be in conflict with the following declaration in the dissenting opinion of Mr. Justice Schauer: "Justice is pictured as being blind but not in the posture of an ostrich, and judicial duty is not performed when a court refuses to follow a law because it conjectures that a higher court which has previously upheld the law may eventually reverse itself." Contrary to this expressed belief of Mr. Justice Schauer, it is my view that the judge who closes his mind and refuses to apply constitutional principles in the light of present day concepts confuses the ostrich which hides his head when danger approaches with the mythical Goddess of Justice whose blindfold is depicted to illustrate her impartiality and freedom from external influences.

My philosophy of the law is and always has been that it is the duty of a judge, in construing the Constitution, to give effect to its provisions and strike down legislation in contravention thereof. (*Werner* v. *Southern Calif. etc. Newspapers*, 35 Cal.2d 121, 137 [216 P.2d 825, 13 A.L.R.2d 252]; *Perez* v.

*Sharp*, 32 Cal.2d 711, 732 [198 P.2d 17] ; *In re Blaney*, 30 Cal.2d 643 [184 P.2d 892] ; *Rescue Army* v. *Municipal Court*, 28 Cal.2d 460 [171 P.2d 8] ; *Gospel Army* v. *City of Los Angeles*, 27 Cal.2d 232 [163 P.2d 704] ; *County of Los Angeles* v. *Southern Calif. Tel. Co.*, 32 Cal.2d 378, 393 [196 P.2d 773] ; *Palermo* v. *Stockton Theatres, Inc.*, 32 Cal.2d 53, 66 [195 P. 2d 1] ; *Takahashi* v. *Fish & Game Com.*, 30 Cal.2d 719, 737 [185 P.2d 805] ; *Hollman* v. *Warren*, 32 Cal.2d 351 [196 P.2d 562] ; *Lockard* v. *City of Los Angeles*, 33 Cal.2d 453, 468 [202 P.2d 38, 7 A.L.R.2d 990] ; *Sandstrom* v. *California Horse Racing Board*, 31 Cal.2d 401, 415 [189 P.2d 17, 3 A.L.R.2d 90] ; *Del Mar Canning Co.* v. *Payne*, 29 Cal.2d 380, 384 [175 P.2d 231] ; *Ferrante* v. *Fish & Game Com.*, 29 Cal.2d 365, 375 [175 P.2d 222].)

The Constitution of the United States is the supreme law of the land and all judges take an oath to support it. In my opinion this oath is violated when courts permit laws to stand or acts to be done in conflict with its provisions. See *People* v. *Rochin*, 101 Cal.App.2d 140, 143 [225 P.2d 1, 913], reversed by the Supreme Court of the United States (*Rochin* v. *California*, 341 U.S. 939 [71 S.Ct. 997, 95 L.Ed. 1366]).

Convinced as I am and always have been that this statute violates basic constitutional guarantees, it is my plain duty to so declare. Even conceding that the Supreme Court of the United States has not overruled *Porterfield* v. *Webb*, 263 U.S. 225 [44 S.Ct. 21, 68 L.Ed. 278], *Webb* v. *O'Brien*, 263 U.S. 313 [44 S.Ct. 112, 68 L.Ed. 318], *Frick* v. *Webb*, 263 U.S. 326 [44 S.Ct. 115, 68 L.Ed. 323], *Terrace* v. *Thompson*, 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255], or *Cockrill* v. *California*, 268 U.S. 258 [45 S.Ct. 490, 69 L.Ed. 944], it has reversed this court on the only recent cases which have considered the problem here involved. Furthermore, that court has recently declared in *Oyama* v. *California*, 332 U.S. 633, at page 646 [68 S.Ct. 269, 92 L.Ed. 249] : "There remains the question of whether discrimination between citizens on the basis of their racial descent, as revealed in this case, is justifiable. Here we start with the proposition that only the most exceptional circumstances can excuse discrimination on that basis in the face of the equal protection clause and a federal statute giving all citizens the right to own land. In *Hirabayashi* v. *United States*, this Court sustained a war measure which involved restrictions against citizens of Japanese descent. But the Court recognized that, as a general rule, 'Distinctions between citizens solely because of their

ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.' 320 U.S. 81, 100 [63 S.Ct. 1375, 87 L.Ed. 1774] (1943)." The foregoing declaration is clearly out of harmony with the basic philosophy announced in the decisions of that court hereinabove cited upholding the alien land laws.

The fundamental principle enunciated by the equal protection clauses of our Constitutions, both state and federal, means equality for aliens within our country, as well as for citizens. It has both antiquity and sanctity for its background. "And if a stranger sojourn with thee in your land, ye shall not vex him. But the stranger that dwelleth with you shall be unto you as one born among you, and thou shalt love him as thyself." (Leviticus 19:33, 34.) And recently this admonition has been fostered by the United Nations Charter as an international policy. Any curtailment of equality must necessarily, therefore, be carefully scrutinized.

After Pearl Harbor, one of the chief arguments advanced for the evacuation from California of the Japanese was, as has been expressed: "Economic practices made Japanese undesirable competitors, and their productive contribution to the nation's economy was negligible." (Grodzins, Americans Betrayed, p. 401.) If the impact of the Japanese on agriculture shortly after 1941 was "negligible"—of no importance —then it cannot be said to be *now* so important as to justify depriving them of their constitutional rights. Indeed, even less importance now exists, for they were placed in detention camps and since their release have been widely dispersed.

In March, 1951, hearings were conducted by Subcommittees of the House and the Senate Judiciary Committees on measures revising the laws on immigration, naturalization and nationality. One of the basic features of the proposed revision was the *elimination of discrimination on the basis of race for both entry of aliens into the country and their eligibility for naturalization.* Many people representing various organizations testified at the hearings. Some of those organizations have heretofore actively participated in sponsoring and fostering the Alien Land Law of California. Yet no one opposed the departure from race as a basis for denying citizenship, and most of them expressly endorsed it. Although not representing any organization, Congressman Judd's statement is typical. He said: "To me, this [the elimination of the racial discrimination] is a matter of simple justice. These people are here. They are legally here. They are entitled to stay

742

here the rest of their lives. Their average age is above 50. They pay taxes; they are good, law-abiding members of their communities. They have proved through their conduct during the war, and especially through the conduct of their children who served with heroism, distinction, and valor in our Armed Forces, that they are loyal to the United States and fully worthy of American citizenship. From the standpoint of our own society, it would be better to have them fully incorporated as citizens than as alien residents.

"Certainly it is better to have them a part of our country than a foreign body in it. I cannot believe there can be substantial objection to allowing them to become naturalized citizens, as they want to. . . .

"I think that, both from the standpoint of our own conscience and from the standpoint of the respect we want the rest of the world to have for us, this is an injustice which should be corrected. It is merely good sense to naturalize those of that group who want to become full-fledged American citizens, as almost every one of them does. That is, everyone, so far as I know." (Joint Hearings before the Subcommittees of the Judiciary, Congress of the United States, 82nd Congress, March 6-April 9, 1951, p. 31.)

It is clear, therefore, that there is not now and never has been any rational basis for excluding the Japanese from land ownership. Even in the field of naturalization and immigration, where Congress may act without constitutional restriction, reason appears to prevail over prejudice. Since there is no logical reason for excluding aliens from naturalization on the basis of race, there is even less reason to exclude them from land ownership when they legally reside here.

Milton R. Konvitz, Associate Professor, Cornell University, had this to say in 1946: "The Japanese were pioneers who reclaimed the San Joaquin Valley from the desert. They turned this land 'from its unhealthy barren state of wasteland into the richest and most productive district in the state of California.' Through sheer perseverance they gained control of the berry, potato, flower, and truck-garden markets. Organized labor and the corrupt politicians, having put the Chinese 'in their place,' turned their attention to the Japanese, who became the scapegoat for every misfortune. The anti-Japanese agitation, it has been said, was predominantly motivated by economic factors; though it has been suggested that the fear of racial intermarriage was not absent.

" 'Man for man, the Japanese immigrants compared very

favorably with the European immigrants of this period,' Treat has observed. 'They were generally literate, almost always law-abiding, industrious, and ambitious to rise in the world.' The Chinese were hated because they were 'servile'; the Japanese were hated because they were industrious and ambitious. The Chinese were hated because they lived in urban ghettos and worked in cities rather than on farms; the Japanese were hated because they preferred agriculture and worked on farms.

"As early as 1907 attempts were made in the California legislature to pass bills to drive the Japanese from the land (and ultimately from California). Owing to the efforts of President Theodore Roosevelt the bills did not then pass. The animus of the persons behind this anti-Japanese drive in the state legislature is well illustrated by the following passage from an address by one of them: 'I would rather,' he told an audience, 'every foot of California was in its native wilderness than to be cursed by the foot of these yellow invaders, who are a curse to the country, a menace to our institutions, and destructive of every principle of Americanism. I want no aliens, white, red, black or yellow to own a foot of land in the State of California.' . . .

"The facts show that there is no relationship between the character of the Japanese in the United States and the prohibition on ownership of land by them, in so far as concerns the public health, morals, or welfare. The record of the Japanese in California is today an open book, and anyone who wants may read it. The record shows them to have been a law-abiding group, loyal to American political institutions, industrious, economically self dependent. They have not used the soil of California to plant in it mines to blow California to the heavens; they used it for the cultivation of vegetables and berries which were the delight of the consumer. They offered economic competition to members of the white race; but can the law be used to *compel* a racial group to give up its habits of industry and skills, and fundamental human rights, and assume a position of economic and social dependence?

"The Supreme Court has said that the differentiation between aliens eligible for citizenship and ineligible aliens is a rational one, for the ineligibles cannot be assumed to have a great interest in the welfare of the people. The facts concerning the Japanese and Chinese and other Asiatics in this country do not bear out this judgment of the court. These people have never hindered the development of our national

policy in the furtherance of the public welfare; they have built railroads for us; they have made berries grow where thistles grew before; they have contributed less than their 'quota' to our prison population. Despite economic handicaps, and placement in positions of social inferiority, they have managed to shift for themselves without leaning on others. How, then, can it be said that their ineligibility for citizenship is a rational justification for depriving them of fundamental human rights?'' (Konvitz, The Alien and the Asiatic in American Law, pp. 157, 168.)

Eugene V. Rostow, Professor of Law, Yale University, with comprehensive citations of scientific authority has this to say: ''. . . the Supreme Court's doctrine of ethnic disloyalty belongs with folk proverbs—'blood is thicker than water'—and the pseudo-genetics of the Nazis. It is flatly contradicted by the evidence of the biological sciences, of cultural anthropology, sociology, and every other branch of systematic social study, both in general, and with specific reference to the position of Japanese groups on the West Coast. The most important driving urge of such minority groups is to conform, not to rebel. This is true even for the American minorities which are partially isolated from the rest of society by the bar of color. The desire to conform is stronger than resentments and counter-reactions to prejudice and discrimination. Insecure and conscious of the environment as a threat, such minorities seek to establish their status by proving themselves to be good Americans.'' (54 Yale L.J., 489, 506.)

The late Dudley O. McGovney, Professor of Law, University of California, made a searching analysis of the entire problem in 1947, and said: ''In what respect does the ownership of some of the farm lands in a state by persons who owe no allegiance to the United States affect the safety of a state, either in time of peace or of war? Has this ancient idea by which early English law writers rationalized the exclusion of all but the King's subjects from certain feudal land tenures any validity in our time? Tenure by knight service, or military tenure, was then conceived of as something that none but persons under allegiance to the King might owe. But 'by the end of the thirteenth century, tenure by knight service had ceased to provide either soldiers or their pay.' Maitland says that if it had been abolished in 1300 the military strength of the realm would have been unaffected. When the statute of 1660 completely abolished military tenure it was merely clearing away what had long been a dead letter so far as military

service was concerned. A connection between tenure and military service had existed only in theory when Coke saw 'destruction of the realm' in landholding by aliens. In our time liability to military service is not dependent upon allegiance. *Resident aliens are now subjected to compulsory military service even in international warfare,* and nothing but legislative policy exempts enemy aliens. An alien is not exempt from draft because he owns farm land. So also Coke's Trojan-horse idea, that aliens owning land 'might fortify themselves in the heart of the realm,' never had any validity in the United States, certainly not since 1798. Congress then passed a statute, ever since in force, authorizing the arrest, confinement, or removal of enemy aliens in wartime. It also authorized the President 'to direct the conduct to be observed, on the part of the United States, toward' enemy aliens. During the war of 1812 with Great Britain, orders by the President and other officials acting under his authority directed all British nationals, fourteen years of age and over, residing within forty miles of tidewater to surrender to United States marshals and be retired further into the interior of the country or to be kept in close confinement. . . .

"The fact that an enemy alien owns farm lands in nowise affects his liability to evacuation. Indeed the ownership of any property by an enemy alien in the United States is an asset to us, rather than a liability or a handicap, in view of the authority given the Alien Property Custodian to seize it, hold it, sell it or otherwise deal with it in the interest, and for the benefit, of the United States.

"Coke's Trojan-horse now lives only in law books or in the minds of persons who unthinkingly accept antiquated 'reasons' for the ancient discrimination that the common law made against aliens with respect to landholding.

"Turning to peacetime, how does alien landholding then affect the safety of the state? I think the complete answer was given to that question by Chief Justice Redfield of Vermont in 1853. The question before the Vermont supreme court was whether the common law against landholding by aliens had been received, or had survived, in the state, and in particular whether Vermont law contained any procedure for the forfeiture of estates of aliens. The court held 'no,' the Chief Justice saying, 'it must, I think, be regarded as questionable how far any such procedure could ever be enforced, for the mere purpose of escheating to the State the lands of a quiet resident or non-resident alien, in time of profound peace,

where no danger was apparent, imminent, or even remotely threatened.'

''If the allegiance of farm owners is of 'highest importance' and the alienage of farm owners affects the safety of the state, the legislators of forty-one of our states are lacking in statecraft, for by their laws the allegiance of those who own farm lands is regarded as of no significance whatever. Rightly included in the forty-one states are the nine 'ineligible alien' land law states for they also regard the allegiance of landowners of no significance except in case of the small numbers of aliens racially ineligible to naturalization. *So California lawmakers see no reason for denying to a half million alien residents the privilege of owning land without limit, though denying that privilege to less than thirty thousand other alien residents because of their race.*

''. . . Even if the allegiance of farmers had significance why is it of significance with respect to the less than thirty thousand 'ineligible aliens' in California but of no significance with respect to a half million other aliens in California who may never seek or acquire citizenship? Moreover, the statement smacks of Coke's exaggeration when he said that if aliens could hold land in England, there would not be enough British freeholders to man the juries. If all the 'ineligible aliens' in California were to exhaust themselves in share cropping, there would be millions of acres of farm lands left for the citizens and other aliens. The same exaggeration is found in a statement with which Justice Butler said he agreed: 'If one incapable of citizenship may lease or own real estate, it is within the realm of possibility that every foot of land within the state might pass to the ownership or possession of noncitizens.' Even if that were a possibility the evil inherent therein is not specified. . . .

''If some evil condition in farming existed in any state, the state might set up a licensing system for farmers and prescribe qualifications deemed essential to overcome the evil, and the Supreme Court would doubtless pay deference to the local judgment on the rationality of the discrimination made thereby. Thus if tillable land were scarce in California relative to the food needs of her population, the state might prescribe qualifications for farming that would exclude all not well qualified as productive operators. If such was the purpose of the California law it fits ill with the fact that the chief charge against 'ineligible aliens,' and the Japanese in particular, was that they were especially skillful and unduly industrious—par-

ticularly in intensive cultivation, involving hard personal labor. It would take a high degree of judicial deference to local judgment to believe that Japanese were the worst offenders in nonproductivity." (Italics added.) (35 Cal.L.Rev. 7, 39.)

Further, it has been said: "They [the Japanese] possessed a remarkable knowledge of soils and of how to treat soils for the production of certain crops; an expert knowledge of the use of fertilizers and of fertilizing methods; a great skill in land reclamation, irrigation, and drainage; and a willingness to put in the enormous amount of labor required in intensive farming operations. They pioneered in the production of many crops. They reclaimed vast areas of the West, including the cut-over timber lands of the Northwest and the valuable delta lands in California. . . . the *San Francisco Chronicle* readily conceded that 'the most striking feature of Japanese farming in California has been the development of successful orchards, vineyards, or gardens on land that was either completely out of use or employed for far less profitable enterprises.'

"It was George Shima, an immigrant, who taught the Californians how to develop a good potato seed. It was Japanese farmers who developed berry production in the West by increasing the yield four or five times over what it had been (planting strawberries and grapevines at the same time so that when the strawberries were replanted three years later a profitable vineyard would be in production). It was the Japanese who took over the semi-abandoned community of Livingston and made it a profitable farming area, and who succeeded in the mountain-fruit section in Placer County after other groups had failed. 'In the Imperial Valley and the Delta country,' observed Robert Welles Ritchie, 'the Japanese never displaced white men, for white men would not work there; and in the mountain fruit district, the Chinese and after them the Japanese came in, after nearly every white man had quit, and made a go of a crippled industry.' In later years the Californians contended that the Japanese were monopolizing the best lands; but candor should have compelled the admission that most of these lands were originally marginal in character.

". . . Their most important contribution to the economy of the West, however, was the manner in which they organized produce production on a year-round basis so as to provide a steady flow of produce to the markets." (McWilliams, Prejudice, p. 79.)

In a recent article by Mr. Blake Clark published in The Freeman on July 16, 1951, he states: "Mrs. Nawa Munemori is the mother of an American World War II hero. A grateful nation bestowed the Congressional Medal of Honor on her son Sadao for wiping out two machine-gun nests and throwing himself on an exploding hand grenade to save his fellow soldiers. The United States Army transport, *Pvt. Sadao Munemori*, which brought his regiment home from Europe, bears his name today. Yet Mrs. Munemori, his widowed mother, is denied citizenship by the country for which her son sacrificed his life.

"Mrs. Munemori symbolizes the plight of victims of our outmoded immigration and naturalization laws, which discriminate against worthy people purely on the basis of their race. These antiquated statutes give the Communists in the Far East a powerful anti-American propaganda weapon, and damage our relations with the people of Asia.

"The situation of some 85,000 aliens in this country demonstrates the unfairness of the position we have taken. About 80,000 are Japanese; 5000 are Koreans and Polynesians, with a sprinkling of other nationalities. These residents legally entered this country before 1924. The Immigration Act of that year permitted them to remain here but continued to deny them the rights of naturalization that were granted to European immigrants. *The sole consideration affecting our treatment of these long-time settlers is their race.*

"Sir Peter Buck, for example, a former professor of anthropology at Yale University, is one of the world's outstanding scientists in his field. England was proud to knight him, but he is refused the privilege of U. S. citizenship. Sir Peter is the son of an Irish father and a Maori mother. The fact that he is half-Maori—*and that alone*—bars Sir Peter from citizenship in his beloved adopted country.

"Before his recent appointment as Korean Ambassador to the United States, Dr. Y. C. Yang was a prominent Honolulu physician, and had practiced in this American community for half a lifetime. He was educated in the United States, is married to an American, and is the father of an American daughter. Dr. Yang would have welcomed American citizenship long ago had it been possible.

"When Pearl Harbor was attacked, Dr. Yang responded immediately to an emergency appeal for medical volunteers to treat the wounded. He worked indefatigably to save the lives of many American seamen. He then volunteered in the

Hawaii National Guard. After being commissioned a captain and serving two weeks, he was notified that his service could no longer be accepted. As a Korean, he was classified as an enemy alien. He could not serve his chosen country—because of his race.

"The Japanese, the largest group affected, have probably contributed more to America than any other Asiatics. Their sons formed the famous 442nd Regimental Combat Team, which probably received more decorations and suffered more casualties than any unit of similar size in the entire U. S. Army. Yet these parents cannot become citizens.

"The abuses against those of Japanese origin are compounded in California, where many of them live. There state laws forbids an alien ineligible for citizenship from owning a farm. Men who have turned acres of desert waste into green, producing fields can cultivate the land only as hired hands.

"The California law makes it a crime for a Japanese alien to 'enjoy, use, occupy, be or remain on the land, or have a beneficial interest in the land, its crops or proceeds.' Temporarily in abeyance pending court decision on a case, this prejudiced law has been so strictly enforced in some counties that families cannot live together. California filed a suit to seize the property of Mrs. Roy K. Hirata, born an American citizen and mother of three citizen children, because her alien husband had helped her cultivate her farm and lived on it. Hirata had to leave home and watch hired strangers gather the crops he had planted.

"Akira Iwamura was eager to get home after two years with Army Intelligence in the Pacific. His father had bought 60 acres of good Fresno grape land in his citizen son's name in 1938, and had been taking care of it for him. California welcomed Akira home from war service with a demand that he forfeit his land—because his alien parent had a beneficial interest in it. Akira's lawyer advised him to settle out of court. In exchange for the state's 'quieting the title,' Akira had to pay half the assessed value of the land to buy back his own acres.

"California is not alone in making the racially ineligible alien run a stiff obstacle course for his livelihood. Nowhere from the Pacific to the Atlantic can he be a lawyer or certified public accountant. Despite shortages in important professions, 26 states prohibit his making a living as a dentist; 25 as a physician; 18 as a teacher. Some 500 laws passed by various

states bar him from such work as a real estate or insurance agent, pharmacist or civil servant. In some states he cannot even accept an old-age pension, although money toward it may have been withheld from his wages!

"The Immigration Act of 1924 was passed to prevent a horde of foreigners from flooding our shores and depressing our wage scale. Legislators worked out an equitable system, as far as the nations of the Old World were concerned. It was agreed that America could readily assimilate 150,000 immigrants a year, about one sixth of one percent of our population as reported in the 1920 census. A quota was assigned to each nation, based on the number of residents each had contributed to our population.

"But, with the exception of Persia and parts of Afghanistan and Russia, Oriental nations received no quota at all. Instead, they were described as constituting the 'Asiatic barred zone,' and were told to keep out. According to Joseph C. Grew, former Ambassador to Japan, it was perhaps the worst mistake we ever made in our relations with the Orient. This gross insult placed a potent weapon in the hands of the Japanese militarists. They used it to promote 'Asia for the Asiatics' throughout the Far East.

"During the war the folly of asking aid from the Chinese while barring them as racially inferior became so obvious that in 1943 we exempted them from the excluded groups. Later the bans against India and the Philippines were lifted. It is time to wipe our record clean of the remaining blots which mar our relations with potential friends and allies.

"On a recent trip around the world I heard repercussions of this short-sighted race prejudice at every stop. In Bangkok a newspaperman said that Communist editors in the Far East constantly told their readers that we consider Orientals racially inferior and despise them. An American official in Rangoon declared that the Burmese ask constantly if the status of our 'outcast law' has been changed.

" 'The Communists,' said a Korean, 'accuse America of fighting a colonial war here. If you extend us a quota, it will help show you mean it when you say we deserve equal democratic rights.' In Japan the chief news over Radio Tokyo for days dealt with the hearings in the House of Representatives on a bill to abolish this racial clause.

"Correcting these abuses would not result in a large flow of foreigners into the United States. Japan's annual quota would be a mere 185, most of the other Asiatic areas would

have 100 each. If every excluded group used a full quota each year, their total would not equal one percent of our 150,000 yearly immigrants. In actual practice, the number of arrivals would be even fewer. Qualifications such as literacy, health and ability to earn a living would keep the number of immigrants from some countries low. In all we could expect each year less than a thousand newcomers, a comparatively infinitesimal number.

''Public-opinion polls show that the great majority of Americans, including Californians, do not want any person denied citizenship because of his race. A bill to this effect, supported by church and civic groups and by our Departments of Justice and State, has three times passed the House by unanimous vote, only to be stopped in Senate committee. Representative Walter Judd, well-known authority on the Far East and one of the bill's sponsors, is convinced that if it could be brought to the floor for a vote the majority of Senators would agree with the majority of other Americans.

''Before the end of World War II, the United States and Nazi Germany were the only two major nations that used race as a test for naturalization. Now, *we alone* maintain this discrimination. In Asia we face a well-organized minority attempting to unite the East against us. We can show the people of the Orient we stand back of our national pledge of 'liberty and justice for all' by welcoming worthy persons and providing them equality under our naturalization and immigration laws. From a purely selfish standpoint, wiping discrimination off the books as well as out of our hearts would be worth more to us in the Orient than a dozen army divisions.''

Numerous other publications and reports have dealt with the impact of Japanese immigrants on the American way of life. I will refer to some of them:

Brown, Francis J. and Roucek, Joseph S., eds. *One America*. The history, contributions and present problems of our racial and national minorities. Rev.ed. Prentice-Hall, 1945;

Bloom, Leonard and Riemer, Ruth. *Removal and Return*. The socioeconomic effects of the war on Japanese Americans. University of California Press;

Foote, Caleb. *Outcast!* The story of America's treatment of her Japanese-American minority. Fellowship of Reconciliation. 1944;

442d Combat Team. *The Album*. Camp Shelby, Mississippi.

La Violette, Forrest E. *Americans of Japanese Ancestry,* a study of assimilation in the American community. Toronto; The Canadian Institute of International Affairs. 1945;

Leighton, Alexander H. *The Governing of Men.* General principles and recommendations based on experience at a Japanese relocation camp. Princeton, N. J., Princeton University Press;

Redfield, Robert. *The Japanese Americans.* The problems of divided loyalty; the evacuation. The University of Chicago Press;

Smith, Bradford. *People From Japan.* The history of the Japanese in America and Hawaii. J. B. Lippincott Co.;

Shirey, Orville C. *Americans: The Story of the 442nd Combat Team.* From activation to occupation with the 442d Regimental Combat Team. Infantry Journal Press;

U. S. Army. Western Defense Command and Fourth Army. Final report, Japanese evacuation from the West Coast. Washington, U. S. Govt. Print. Off., *Pt. I through IX.* Signed by Lt. Gen. J. L. DeWitt, U. S. army, commanding;

U. S. Bureau of Agricultural Economics. *Japanese farm holdings on the Pacific Coast,* by Adoni Poli. Berkeley, Calif. Processed. Detailed tables; and

U. S. Congress. Select Tolan Committee Investigating National Defense Migration.

These publications and reports, like those from which I have quoted above, demonstrate the fallacy of the basic concept underlying the decisions holding that the race or nationality of a person is a proper basis for the classification of those who are ineligible to own land or other property. This concept is based upon a factual background which was assumed at the time our present immigration, naturalization and alien land laws were adopted and upheld by our courts, but which has since been shown to be without foundation. It would seem, therefore, that the maxim that "when the reason for the rule ceases, the rule itself ceases," should be applicable here.

I am, therefore, of the opinion that the race or nationality of a person is not a proper basis for a classification of aliens eligible to own land or other property, and that the provisions of the California Alien Land Law barring aliens ineligible to citizenship from owning land here are in violation of the equal protection clauses of both the Constitution of the United States and the Constitution of California.

SCHAUER, J., Dissenting and Concurring.—This case is remarkable and regrettable in judicial annals for this reason: A majority of the justices of this court join in an opinion which recognizes the law as it is but refuses to follow it.

There is no question as to what the law is. It was enacted in the year 1920 by the people of California through the initiative (1 Deering's Gen. Laws, Act 261); it is based, as to the classification established, on an act of the Congress of the United States[1]; for the past 32 years this law, as will appear more fully in the cases hereinafter cited and discussed, has been consistently upheld by this court and by the Supreme Court of the United States as against the precise attack now made on it. But now, say the majority, upon an elaborate analysis of the trend of recent decisions of the Supreme Court of the United States, they think that that court, if the question were to be again presented to it might or would change its holding. The most careful study of the majority opinion discloses no other legal basis for their holding than this conjecture.

If this court may properly anticipate that the United States Supreme Court may in the future reverse its prior holdings and if we may act in reliance upon such anticipation, then what criticism can we in good grace offer if hereafter parties litigant anticipate that our judgments may be reversed by ourselves or stricken down by the federal Supreme Court, and upon such anticipation flaunt our judgments? Have we not today established a precedent for just such action? What labor union or employers' organization or little man could consistently be denied the right to follow us in speculation and anticipation and to act in reliance thereon?

The majority opinion, I think, is not motivated by an effort to find the law, and to uphold it as found. I think it stems more from the strong social views of the justices who write it and from their desire to make the law what they think it should be. But whether this law should be modified or repealed or continued in force is not, I think, a proper subject for our debate or ruling. The people enacted it and, as already noted, the only classification it makes is created by an act of the Congress of the United States. By constitutional processes the people, if they will, can amend or repeal it or the Congress can abolish the classification. But until and unless the people or the Congress act by the constitutional

---

[1]Naturalization Act of 1790, 18 Stats. 318 (1875); 8 U.S.C.A. § 703, 54 Stat. 1140, ch. 876 (1940).

process, the law should not unnecessarily be stricken down by judicial intervention.

That the justices who join in striking down this law find it obnoxious to their personal social views and to their concepts of desirable international relations is quite understandable, and that they shall examine the law in the light of their personal views and concepts is of course a part of our judicial process. But our legitimate judicial process likewise requires that we indulge every reasonable presumption in favor of the validity of a law whether we like it or not; that, when personal views and public law differ, we subjugate our personal social views and concepts to the law adopted by the people; and that we not strike down as unconstitutional any law which, consistently with constitutional precepts, can be sustained. That this law can be sustained is indubitably demonstrated by the plain fact that for 32 years it has been sustained both by this court and the United States Supreme Court. As recently as *People* v. *Oyama* (1946), 29 Cal. 2d 164 [173 P.2d 794] (opinion for the court by Mr. Justice Edmonds), we upheld the validity of the act today held void. It is noteworthy and commendable that Mr. Justice Traynor therein concurring said (p. 181): "I concur in the judgment on the ground that the decisions of the United States Supreme Court cited in the main opinion are controlling until such time as they are reexamined and modified by that court." This concurrence by Justice Traynor exemplifies conformance to the duty of a judge as it is usually understood and respected; it suggests that the judicial duty is obnoxious to personal desire but that respect for the law must and will prevail. The decisions he refers to have been reexamined but they have not been modified in the controlling point by the court which rendered them. The implicit and utter soundness of the principles of constitutional law upon which they rest, stand unweakened and untarnished— until today. Compliance with the law and faithful discharge of judicial duty, in my view, furnish a light which is as clear today as it was in 1946. Certainly the law may progress. But change is not necessarily progress; it may be destruction rather than growth.

Also recently this court (again speaking through Mr. Justice Traynor for the majority) said, in *Werner* v. *Southern Calif. etc. Newspapers* (1950), 35 Cal.2d 121, 131 [216 P.2d 825, 13 A.L.R.2d 252], quoting from *County of Los Angeles* v. *Southern Calif. Tel. Co.* (1948), 32 Cal.2d 378 [196 P.2d

773], quoting in turn from *People* v. *Western Fruit Growers* (1943), 22 Cal.2d 494, 507 [140 P.2d 13]. " ' "When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of existence of that state of facts, and the burden of showing arbitrary action rests upon the one who assails the classification." ' " If that principle were followed here the Alien Land Law could not be stricken down. It has been upheld by the Supreme Court of the United States; it still stands except as this court today refuses to abide by it, refuses to uphold the will of the people of California and concludes, contrary to the announced decisions of the Supreme Court of the United States, and to the many earlier determinations of this court, that the law contravenes the federal Constitution. It is, indeed, an unusual procedure when a state court holds unconstitutional on federal grounds a state act which the United States Supreme Court holds to be constitutional as against the same attack. In my view, the only unconstitutional procedure apparent here is the act of the majority justices in using the judicial process to impose their social views on the people of California, rather than, if they were so minded, actively pursuing the obvious legislative remedy.

Of substituting the judicial process for the legislative, again in *Werner* v. *Southern Calif. etc. Newspapers* (1950), *supra* (p. 129 of 35 Cal.2d), the majority of this court said: "It is for the Legislature . . . to choose between conflicting policies, and this court may not presume that in reaching its decision it acted upon improper motives . . . 'We cannot undertake a search for motive in testing constitutionality . . .'

"This court cannot invoke the due process clause to invalidate a legislative policy that it may deem unwise without exercising judicial censorship directed not at the constitutionality of legislation but at its wisdom, a censorship whose dangers Mr. Justice Holmes clearly envisaged: 'I have not yet adequately expressed the more than anxiety that I feel at the ever increasing scope given to the Fourteenth Amendment in cutting down what I believe to be the constitutional rights of the States. As the decisions now stand, I see hardly any limit but the sky to the invalidating of those rights if they happen to strike a majority of this Court as for any reason undesirable. I cannot believe that the Amendment was intended to give us *carte blanche* to embody our economic or moral beliefs in its prohibitions.' (*Baldwin* v. *Missouri*, 281 U.S. 586, 595 [50 S.Ct. 436, 74 L.Ed. 1056], dissent.)

This view has found increasing acceptance by the United States Supreme Court. 'This Court beginning at least as early as 1934 when the *Nebbia* case was decided, has steadily rejected the due process philosophy enunciated in the *Adair-Coppage* line of cases. In doing so it has consciously returned closer and closer to the earlier constitutional principle that states have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law. [Citations.] Under this constitutional doctrine the due process clause is no longer to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare.' (*Lincoln Fed. L. Union* v. *Northwestern I. & M. Co.*, 335 U.S. 525, 536-537 [69 S.Ct. 251, 93 L.Ed. 212, 6 A.L.R.2d 473].)

" 'Despite evidence to the contrary, respondents see no evil to be corrected by this legislation. We are asked to agree with respondents and call the statute arbitrary and unreasonable.

" 'Looking through the form of this plea to its essential basis, we cannot fail to recognize it as an argument for invalidity because this Court disagrees with the desirability of the legislation. We rehearse the obvious when we say that our function is thus misconceived. We are not equipped to decide desirability; and a court cannot eliminate measures which do not happen to suit its tastes if it seeks to maintain a democratic system. The forum for the correction of ill-considered legislation is a responsive legislature.' (*Daniel* v. *Family Secur. L. Ins. Co.*, 336 U.S. 220, 224 [69 S.Ct. 550, 93 L.Ed. 632, 10 A.L.R.2d 945].)

"The responsiveness of a legislature reflects the alertness of the electorate, and legislation ill-considered in a climate of indifference may continue to flourish in such a climate to the dismay of interested citizens whose numbers may be small. If these few then turn impatiently to the courts, however, abandoning the hard task of dispelling the general lethargy, they accomplish nothing to improve legislation, for if courts are called upon to set their judgment as to what is wise against the popular judgment they may summarily put an end to certain laws that may be foolish but also to certain laws that may be wise, and particularly to laws that may be

wise in the long run although they appear foolish at the moment. 'Most laws dealing with economic and social problems are matters of trial and error. That which before trial appears to be demonstrably bad may belie prophecy in actual operation. It may not prove good, but it may prove innocuous. But even if a law is found wanting on trial, it is better that its defects should be demonstrated and removed than that the law should be aborted by judicial fiat. Such an assertion of judicial power deflects responsibility from those on whom in a democratic society it ultimately rests—the people.' (Mr. Justice Frankfurter concurring in *A.F.L.* v. *American Sash & D. Co.*, 335 U.S. 538, 553 [69 S.Ct. 258, 93 L.Ed. 222, 6 A.L.R.2d 481].)''

This case today is probably not of such immediately grave importance to the citizens of California, and to the United states as a nation, as it would have been prior to the events of the period between December 7, 1941, and August 14, 1945. The long-planned occupation and conquest of California by Japan has been at least for the foreseeable future averted. That nation, finally defeated at horrible cost to the United States and to other freedom-loving peoples of the world, as well as to itself, is now building a new government. It is to be hoped that this new government may in time prove its right to, and thereupon be welcomed in, the family of nations as a champion of peace and good will and a defender against aggressors, their stealth, their devices, their cunning and their violence. It is indeed to be fervently hoped that the people of this late enemy nation, though perhaps unwillingly rescued from totalitarianism, may espouse the principles of democracy, and of forthrightness, honesty, reason and gentleness for their own government and in their dealings with all. But the validity of a law should be decided on facts as they existed at the time of its enactment, not on social theories or expectation for the future, or speculation that the United States Supreme Court may eventually change its ruling on a constitutional issue. Justice is pictured as being blind but not in the posture of an ostrich, and judicial duty is not performed when a court refuses to follow a law because it conjectures that a higher court which has previously upheld the law may eventually reverse itself.

Even if we forsake completely the doctrine of *stare decisis* and reexamine the statute in question in all its aspects, its validity is unquestionable on any sound approach.

The question is whether one of the states of our union may

properly place restrictions upon the rights in real property within its boundaries which may be enjoyed by an alien resident whom the Congress of the United States has not made eligible to citizenship.[2]

Regulation of the devolution and ownership of land within its borders has been traditionally considered an attribute of state sovereignty (*United States* v. *Fox* (1876), 94 U.S. 315, 320 [24 L.Ed. 192]; *Hauenstein* v. *Lynham* (1879), 100 U.S. 483, 484 [25 L.Ed. 628]; *Blythe* v. *Hinckley* (1901), 180 U.S. 333 [21 S.Ct. 390, 393-394, 45 L.Ed. 557]). Plaintiff, however, contends that the Alien Land Law of this state violates the due process and equal protection clauses of the Fourteenth Amendment, invades the field of federal power over immigration, and is inconsistent with the United Nations Charter. He also contends that the law is invalid special legislation prohibited by the Constitution of this state, and that it unlawfully delegates state legislative power to Congress.

### *Constitutionality*

With regard to equal protection, plaintiff urges, first, that statutory classification of aliens on the basis of eligibility to citizenship is arbitrary insofar as discrimination against the ineligible bears no reasonable relationship to promotion of the safety and welfare of the state. He argues that the statute distinguishes not between citizens and aliens, but between classes of aliens, and that persons eligible to citizenship are given all the ownership rights of citizens regardless of whether they intend to become naturalized. Secondly, he contends that the purpose and effect of the statute is to discriminate against

---

[2]Restrictions on the right of aliens to hold land are no innovation in the law. Since 1887 there has been a federal Alien Land Law which, with certain exceptions, prohibits aliens who have not declared their intention to become citizens from owning territorial land. (8 U.S.C.A. §§ 71-86.) Every state has made some provision with regard to the rights of aliens to own real property. (See 5 Vernier, American Family Laws (1938), 304-346; McGovney, ''The Anti-Japanese Land Laws of California . . .,'' 35 Cal.L.Rev. at pp. 21-24.) Of these about twenty-one states expressly allow aliens, at least those residing in the state, all the property rights of citizens. All the remaining states impose some kind of disabilities on aliens, and these vary from outright prohibition of land ownership to limitations on the size of holdings or the time land may be held. Some of these statutory restrictions apply to all aliens. Other states distinguish between classes of aliens, such as those who have and have not declared their intention to become citizens, those who are and who are not eligible to citizenship, those who are enemies and those who are friends. Nine states, other than California, classify on the basis of eligibility to citizenship.

aliens solely on the basis of race and that such discrimination is arbitrary and irrational.

Although it is declared by the United States Supreme Court in the restrictive covenants case, *Shelley* v. *Kraemer* (1947), 334 U.S. 1 [68 S.Ct. 836, 841, 92 L.Ed. 1161, 3 A.L.R.2d 441], relied upon by plaintiff, that ''It cannot be doubted that among the civil rights intended to be protected from discriminatory state action by the Fourteenth Amendment are the rights to acquire, enjoy, own and dispose of property,'' it must be borne in mind that the Shelley case involved the property rights of a negro *citizen*.[3] The rule is, of course, settled that the Fourteenth Amendment protects aliens as well as citizens from unreasonable or discriminatory state action. (*Yick Wo* v. *Hopkins* (1885), 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220]; *Truax* v. *Raich* (1915), 349 U.S. 33 [36 S.Ct. 7, 6 L.Ed. 131].) And, as to equal protection, where rights *other* than those relating to land ownership are involved the United States Supreme Court has stated that ''The power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits.'' (*Takahashi* v. *Fish & Game Com.* (1948), 334 U.S. 410 [68 S.Ct. 1138, 1143, 92 L.Ed. 1478].) However, in 1923 the United States Supreme Court upheld the Washington and California Alien Land Laws against attack on due process and equal protection grounds, and those decisions have never been overruled. (*Terrace* v. *Thompson,* 263 U.S. 197 [44 S.Ct. 15, 68 L.Ed. 255] [Washington statute]; *Porterfield* v. *Webb,* 263 U.S. 225 [44 S.Ct. 21, 68 L.Ed. 278] [California statute]; see, also, *Webb* v. *O'Brien,* 263 U.S. 313 [44 S.Ct. 112, 68 L.Ed. 318], and *Frick* v. *Webb,* 263 U.S. 326 [44 S.Ct. 115, 68 L.Ed. 323], sustaining constructions of the California statute which prohibited aliens ineligible to citizenship from entering into cropping contracts or holding stock in farming corporations, respectively.)

---

[3]It should be noted that federal legislation enacted pursuant to the Thirteenth and Fourteenth Amendments does *not* secure to aliens any rights to acquire real property. The Civil Rights Act provides that ''All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.'' (8 U.S.C.A. § 42, based on 14 Stat. 27 and 16 Stat. 144.) However, no similar provision is made for noncitizens. The act merely provides: ''All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens. . . .'' (8 U.S.C.A. § 41, based on 14 Stat. 27 and 16 Stat. 144.)

The leading case, *Terrace* v. *Thompson*, involves the Washington law which prohibited land holding by all aliens except those who had declared an intention to become American citizens.[4] The court disposes of the due process argument in the following manner (pp. 216-217 of 263 U.S.): "The Fourteenth Amendment . . . protects the owners in their right to lease and dispose of their land for lawful purposes and the alien resident in his right to earn a living by following ordinary occupations of the community, but it does not take away from the State those powers of police that were reserved at the time of adoption of the Constitution [citations]. . . . And, while Congress has exclusive jurisdiction over immigration, naturalization and the disposal of the public domain, each State, in the absence of any treaty provision to the contrary, has power to deny to aliens the right to own land within its borders." The court points out the common law rule that an alien could not hold land against seizure by the crown and concludes that state legislation withholding from all aliens equally the right to hold land "can not be said to be capricious or to amount to an arbitrary deprivation of liberty or property, or to transgress the due process clause." (P. 218 of 263 U.S.)

Turning to the equal protection argument the court rejects as "without foundation" the contention that the Washington statute discriminated on grounds of race or color, stating that, by the terms of the statute, all aliens, of whatever race or color, who failed to declare their intention to become citizens were prohibited from owning agricultural lands. The court then holds that discrimination on the basis of ineligibility to citizenship did not violate the equal protection clause, for the following reasons (pp. 220-221 of 263 U.S.) : "Two classes of aliens inevitably result from the naturalization laws—those who may and those who may not become citizens. *The rule established by Congress on this subject, in and of itself, furnishes a reasonable basis for classification in a state law withholding from aliens the privilege of land ownership.* [Italics added.] . . .

"It is obvious that one who is not a citizen and cannot become one lacks an interest in, and the power to effectually work for the welfare of, the state, and, so lacking, the state may rightfully deny him the right to own and lease real estate within its boundaries. If one incapable of citizenship may

---

[4] This classification automatically places aliens ineligible to citizenship within the prohibited group.

lease or own real estate it is within the realm of possibility that every foot of land within the state might pass to the ownership or possession of non-citizens. . . . The quality and allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the state itself.''

The court in the Terrace decision discusses the case of *Truax* v. *Raich* (1915), *supra,* 239 U.S. 33, which involves an Arizona statute requiring all employers of more than five persons to employ not less than 80 per cent qualified electors or native-born citizens. It is there held that the statute violated the equal protection clause in discriminating against alien inhabitants, lawfully in the state, with regard to the ''right to work for a living in the common occupations of the community,'' and, further, that the denial of such right to aliens would be tantamount to denying them entrance and abode in the state and would conflict with the exclusive federal power over immigration.

The ''right to work for a living in the common occupations of the community,'' secured to *all* aliens by the Truax case, was urged as a reason for invalidating alien land laws in the Terrace case but is distinguished by the court as follows (p. 221 of 263 U.S.) : ''In the case before us the thing forbidden is very different. It is not an opportunity to earn a living in common occupations of the community, but it is the privilege of owning or controlling agricultural land within the State. The quality and allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the State itself.''

*Porterfield* v. *Webb* (1923), *supra,* 263 U.S. 225, upholding the constitutionality of the California Alien Land Law, was decided the same day as *Terrace* v. *Thompson* and was held to be controlled by the Terrace decision. The court, in a short opinion reasons as follows: The prohibited class in the Washington Alien Land Law were all nondeclarant aliens; this necessarily included all aliens ineligible for citizenship, which smaller group constituted the prohibited class defined by the California act; forbearance of California to extend the prohibition to eligible aliens who failed to declare their intent to become citizens could not be said to be arbitrary or unreasonable.

As noted above, *Terrace* v. *Thompson* and its companion cases have not only never been overruled by the United States

Supreme Court, but the constitutionality of the California statute was again upheld by this court as recently as *People* v. *Oyama* (1946), *supra*, 29 Cal.2d 164. Although the Supreme Court of the United States reversed our decision (*Oyama* v. *State of California* (1948), 332 U.S. 633 [68 S.Ct. 269, 92 L.Ed. 249]), upon the narrow ground that a presumption declared by section 9(a) of the act, and relied on in the case, violated the rights of *citizens* who were the children of ineligible aliens and arbitrarily discriminated against such citizens, I cannot overlook the highly important fact that that court refused to overrule its earlier holdings that the Alien Land Law is constitutional insofar as it relates to the land rights of ineligible aliens themselves. These holdings, as well as our own antecedent expressions to the same effect, are sound expositions of the best constitutional precepts.

It is inescapable that it is settled by the foregoing cases and numerous other decisions sustaining the validity of specific provisions of the Alien Land Law that classification on the basis of eligibility to citizenship is proper for the purpose of determining who may own and enjoy land.

With reference to the statement made in the Terrace case that if aliens ineligible to citizenship could own farm land, they might possibly acquire all such land in the state, plaintiff argues that natural events and changes in the naturalization and immigration laws since the Terrace decision have reduced such a possibility to the vanishing point. Moreover, he urges, these changes in circumstances of themselves warrant reexamination of the land law.

When the Terrace case was decided, in 1923, only white persons and persons of African nativity and descent were eligible to become citizens. (Naturalization Act of 1790; 18 Stat. 318 (1875).) At the time the present proceeding was begun, in 1949, the naturalization laws had been amended to provide that the following may become citizens: "descendants of races indigenous to the Western Hemisphere" (8 U.S.C.A. § 703; 54 Stat. 1140, ch. 876 (1940)); "any person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States" (8 U.S.C.A. § 1001; 56 Stat. 182 (1942)); Chinese persons and persons of Chinese descent (8 U.S.C.A. § 703; 57 Stat. 601 (1943)); Filipinos and persons indigenous to India (8 U.S. C.A. § 703; 60 Stat. 416 (1946)). Thus, in 1949, the California Alien Land Law could operate only against Orientals who are Japanese and against certain other races, such as

Polynesians.[5] According to 1940 census figures, the alien Japanese population discovered and counted in California was 33,569. Immigration of persons ineligible to citizenship was halted by the Exclusion Act of 1924 (43 Stat. 161, 8 U.S.C. § 213(c)); hence the number of Japanese aliens legally in the state in 1949 was probably less than in 1940 due to death, changes of residence, deportation and other causes. For the purposes of the constitutional test of state legislation, however, it is immaterial that the number of races embraced in the ineligible class has been narrowed by the Congress through recent amendments to the naturalization laws; the Congress itself has made and it has preserved the class; it has set and defined the limits and the qualifications of eligibles; the class of ineligibles may be broadened again in the future and it is still within the realm of possibility that ineligible aliens might acquire a disproportionate share, or dangerously located and extensive areas, of land in the state.

Plaintiff further contends that most, if not all of the reasoning of the Terrace and Porterfield cases has been repudiated by the United States Supreme Court in *Oyama* v. *State of California* (1948), *supra,* 68 S.Ct. 269; *Ex parte Endo* (1944), 323 U.S. 283, 302 [65 S.Ct. 208, 89 L.Ed. 243]; and *Takahashi* v. *Fish & Game Com.* (1948), *supra,* 68 S.Ct. 1138, and that a state court may "properly" disregard them, as, it is said, was recently done by the Oregon Supreme Court in *Namba* v. *McCourt* (1949), 185 Ore. 579 [204 P.2d 569]. It was there held that the Oregon Alien Land Law, one similar to the California statute, violated the Fourteenth Amendment in placing restrictions on aliens ineligible to citizenship but not on other aliens, since there was no valid reason why the ineligibles, as a class of aliens, should not be permitted to own and rent agricultural land. The court reviewed the decisions of the United States Supreme Court on the subject, giving particular attention to the Oyama and Takahashi cases, and conjectured that the United States Supreme Court "no longer deems the [Terrace and related] cases binding." (No petition for certiorari to the United States Supreme Court was filed.) Regardless of the thought expressed by the Oregon court, it is my view that since none of the cases relied upon

[5] For purposes of this discussion, defendant excludes from consideration all persons ineligible to citizenship for reasons other than their race, such as those who do not speak English or have not satisfied the residence requirement or are not attached to the political principles of this country. (See 8 U.S.C.A. § 704 et seq.)

by plaintiff passed upon the power of the state to regulate alien ownership of land within its boundaries, such cases are not controlling here.

In reliance upon the statements in the Truax and Takahashi cases that discrimination is invalid when it deprives an alien of the "right to work for a living in the common occupations of the community," or prevents him from "earning a living in the same way that other state inhabitants earn their living" (*Truax* v. *Raich* (1915), *supra*, 36 S.Ct. 7, 10; *Takahashi* v. *Fish & Game Com.* (1948), *supra*, 68 S.Ct. 1138, 1142), plaintiff urges that although farming is one of the most ancient and common ways of earning a living, the *Terrace* v. *Thompson* rule permits a state, in the absence of a treaty, to so restrict an alien that he can farm land only in the capacity of an employee or hired hand, and also permits a state to restrict an alien in following occupations other than farming, since it is necessary to the operation of any ordinary business or industry to own or lease land upon which a shop or factory may be located. The effect of such legislation, argues plaintiff, is to impose upon the alien ineligible to citizenship an economic status inferior to that of all other persons living in the state. Such argument ignores the fact that land ownership is held by only a relatively few of the inhabitants of this state and nation, is not at all a necessary attribute of an equality of economic status, and is not desired or availed of by many who enjoy ample economic security. It is, therefore, not persuasive to the end of striking down a law which has been duly enacted by the people of the state and which has been sustained by the highest courts of state and nation for more than a quarter of a century.

The critical question (if this court assumes to reexamine the problem) in determining whether the land law accords with the guarantee of equal protection is whether the discrimination between persons ineligible to citizenship and those who are citizens or eligible to citizenship is "based upon some difference in the classes having a substantial relation to a legitimate object to be accomplished." (See *Takahashi* v. *Fish & Game Com.* (1947), 30 Cal.2d 719, 727 [185 P.2d 805] (reversed 334 U.S. 410, 422 [68 S.Ct. 1138, 92 L.Ed. 1478], on the ground that the classification there involved was unconstitutionally discriminatory, but expressly distinguishing the land law cases) ; see, also, *Werner* v. *Southern Calif. etc. Newspapers* (1950), *supra*, 35 Cal.2d 121, 131; *Watson* v. *Division of Motor Vehicles* (1931), 212 Cal. 279, 284-285

[298 P. 481].) And, as plaintiff concedes, upon the outcome of this question will depend the answer to plaintiff's contention that the Alien Land Law constitutes special legislation in violation of the California Constitution. (See *Lelande* v. *Lowery* (1945), 26 Cal.2d 224, 232 [157 P.2d 639, 175 A.L.R. 1109]; *County of Los Angeles* v. *Southern Calif. Tel. Co.* (1948), *supra,* 32 Cal.2d 378, 389.)

The following pertinent principles are well established: "Wide discretion is vested in the Legislature in making the classification and every presumption is in favor of the validity of the statute; the decision of the Legislature as to what is a sufficient distinction to warrant the classification will not be overthrown by the courts unless it is palpably arbitrary and beyond rational doubt erroneous. [Citations.] A distinction in legislation is not arbitrary if any set of facts reasonably can be conceived that would sustain it." (*Sacramento M. U. Dist.* v. *Pacific Gas & Elec. Co.* (1942), 20 Cal.2d 684, 693 [128 P.2d 529]; see, also, *In re Herrera* (1943), 23 Cal. 2d 206, 212 [143 P.2d 345]; *Reclamation District* v. *Riley* (1923), 192 Cal. 147, 156 [218 P. 762].) "The existence of facts supporting the legislative judgment is to be presumed and the burden of overcoming the presumption of constitutionality is cast upon the assailant." (*Takahashi* v. *Fish & Game Com.* (1947), *supra,* 30 Cal.2d 719, 728; see, also, *People* v. *Western Fruit Growers* (1943), *supra,* 22 Cal.2d 494, 507; *In re Fuller* (1940), 15 Cal.2d 425, 437 [102 P.2d 321]; *California Physicians' Service* v. *Garrison* (1946), 28 Cal.2d 790, 803 [172 P.2d 4, 167 A.L.R. 306].) The classification should be reasonable; i. e., "have a substantial relation to a legitimate object to be accomplished . . . [I]t is not our concern whether the Legislature has adopted what we might think to be the wisest and most suitable means of accomplishing its objects. [Citations.]" (*Lelande* v. *Lowery* (1945), *supra,* 26 Cal.2d 224, 232, 234.)

In *Werner* v. *Southern Calif. etc. Newspapers* (1950), *supra,* 35 Cal.2d 121, 131, quoting from *County of Los Angeles* v. *Southern Calif. Tel. Co.* (1948), *supra,* 32 Cal.2d 378, 390, and *People* v. *Western Fruit Growers* (1943), *supra,* 22 Cal.2d 494, 506, the rule is reaffirmed in these words: "Problems of classification under the California Constitution are thus similar to those presented by the federal equal protection of the laws clause of the 14th Amendment. Under either provision, the mere production of inequality which necessarily results to some degree in every selection of persons for regulation

does not place the classification within the constitutional prohibition. The discrimination or inequality produced, in order to conflict with the constitutional provisions, must be 'actually and palpably unreasonable and arbitrary,' or the legislative determination as to what is a sufficient distinction to warrant the classification will not be overthrown. [Citations.] When a legislative classification is questioned, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of existence of that state of facts, and the burden of showing arbitrary action rests upon the one who assails the classification.''

Applying these rules to the present controversy, it can hardly be seriously doubted that use or ownership of land by persons ineligible to citizenship may reasonably be determined by the people of a state to constitute a threat to the safety or welfare of the state because such ineligible persons cannot be bound by an oath of allegiance to the United States, of which each state is an inseparable part, and, as a class, their loyalty to and interest in the state are suspect, and further, such ownership of the land by its citizens, or those who can become such, bears a vital relationship to the strength of a free country. As declared in *Mott* v. *Cline* (1927), 200 Cal. 434, 447 [253 P. 718], ''It has been firmly settled by the decisions of both federal and state courts [citations] that the adoption of the Alien Land Acts was a lawful exercise of the police power. In fact, it is the exercise of that power in its highest and truest sense. The ownership of the soil by persons morally bound by obligations of citizenship is vital to the political existence of the state. It directly affects its welfare and safety.''[6] (See, also, *Palermo* v. *Stockton Theatres, Inc.* (1948), 32 Cal.2d 53, 63 [195 P.2d 1].) The question is not whether every individual ineligible alien may be said to be disloyal to this nation, but whether the loyalty of such ineligible aliens *as a class* may be doubted.[7] It is not within the province of this court, especially in the light of history which need go no further back than December 7, 1941, to declare

[6]The importance attached to domestic control of land ownership is not merely local to this state or nation; its far-flung recognition must be obvious to every reader of history or current events. We need mention only two examples: (1) The relatively recent expropriation acts of the Republic of Mexico; (2) the pending controversy between Great Britain and Iran over the petroleum bearing lands of the latter nation.

[7]As is pointed out by Walter Pitkin in his ''Must We Fight Japan?'' (1921, The Century Co., p. 440), ''The loyalty of the Japanese to his Government stands above all else. That is his religion.''

that such doubt is unreasonable and bears no substantial relationship to the public welfare.

Likewise without merit is plaintiff's contention that the purpose and effect of the Alien Land Law is to discriminate against him solely because of his race, and that despite the fact that the law does not mention race or color on its face we should determine that it was the result of race prejudice against Orientals and particularly Japanese, and declare it therefore unconstitutional. In this respect plaintiff relies upon certain arguments in favor of the legislation contained in the official pamphlet[8] mailed to the voters prior to the election at which the act was to be voted upon, as well as on statements in *Estate of Yano*[9] (1922), 188 Cal. 645, 654, 658 [206 P. 995]. Plaintiff's position on this point ignores the fundamental and controlling fact, however, that it is those who are ineligible for citizenship, regardless of race or color, to whom the Alien Land Law applies, and that it is Congress and not the State of California that determines such ineligibility. It is clear that the statements in *Estate of Yano* upon which plaintiff relies have no application to the problem here involved and do no more than recognize that Japanese fall within the class whom Congress has refrained from declaring eligible. Moreover, as pointed out in the Terrace case (p. 223 of 263 U.S.), it was in accordance with the desire of Japan that the right to own land was not conferred by either that nation or the United States upon the nationals of the other. To argue, in the face of such circumstance, that the California Alien Land Law is directed at plaintiff solely because of his race simply denies reality. Furthermore, the fact that the attention of the citizens was being attracted chiefly to the

[8]The following argument appears in the pamphlet: "Its primary purpose is to prohibit Orientals who cannot become American citizens from controlling our rich agricultural lands . . . Orientals, and more particularly Japanese, [have] commenced to secure control of agricultural lands in California." Further arguments in the pamphlet in support of the measure were directed against the Japanese alone, without reference to other Orientals or to others who were ineligible for American citizenship.

[9]Yano involves a provision of the act prohibiting the appointment of an ineligible alien as guardian of land. The court, in holding that the right of a father to be appointed guardian of the person and estate of his citizen minor child did not depend upon his own eligibility to citizenship, stated that the prohibitory provision "is clearly a discrimination against citizens of Japan residing in this state," and that the object thereof was "to discourage the coming of Japanese into this state."

Japanese *by the very nature and extent of their activities*[10] *in the state,* far from showing racial prejudice as the motivating cause for the land act, indicates a sound basis for the law.

Plaintiff's argument that the Alien Land Law interferes with the power of Congress over legislation is answered by the declaration in the Terrace case (p. 217) that "while Congress has exclusive jurisdiction over immigration, naturalization and the disposal of the public domain, each State, in the absence of any treaty provision to the contrary, has power to deny to aliens the right to own land within its borders." *Traux* v. *Raich* (1915), *supra,* 239 U.S. 33, 42, and *Takahashi* v. *Fish & Game Com.* (1948), *supra,* 334 U.S. 410, 419, do not involve land laws, and statements therein which are relied upon by plaintiff are not controlling here.

---

[10]The California State Board of Control in 1920 prepared a report on the situation then confronting the state. In a letter of transmittal of the report (and published therewith), written by Governor Wm. D. Stephens of California to Hon. Bainbridge Colby, Secretary of State, Washington, D. C., dated June 19, 1920, the following reference is made to facts which appear more fully in the report itself: "The Japanese in our midst have indicated a strong trend to land ownership and land control, and by their unquestioned industry and application, and by standards and methods that are widely separated from our occidental standards and methods, both in connection with hours of labor and standards of living, have gradually developed to a control of many of our important agricultural industries. Indeed, at the present time they operate 458,056 acres of the very best lands in California. The increase in acreage control within the last decade, according to these official figures has been 412.9 per cent. In productive values—that is to say, in the market value of crops produced by them—our figures show that as against $6,235,856 worth of produce marketed in 1909, the increase has been to $67,145,730, approximately tenfold.

"More significant than these figures, however, is the demonstrated fact that within the last ten years Japanese agricultural labor has developed to such a degree that at the present time between 80 and 90 per cent of most of our vegetable and berry products are those of the Japanese farms. Approximately 80 per cent of the tomato crop of the state is produced by the Japanese; from 80 to 100 per cent of the spinach crop; a greater part of our potato and asparagus crops and so on. So that it is apparent that without much more effective restrictions that in a very short time, historically speaking, the Japanese population within our midst will represent a considerable portion of our entire population, and the Japanese control over certain essential food products will be an absolute one." ("California and the Oriental" by State Board of Control of California, 1920 ed., pp. 8, 45, 49-52.)

Again, Walter B. Pitkin in "Must We Fight Japan?" (The Century Co., 1921), speaks of the competition imposed on the non-Oriental American farmer who made a practice of taking Sundays off and of working only ten or twelve hours a day, by the Japanese whose schedules ran from fourteen to eighteen hours a day. Says Mr. Pitkin (pp. 207-8): "The results of such competition can be clearly read all over California. For the statistics we need not go to American observers, who may be suspected of prejudice. We have luckily at hand a com-

Plaintiff's further contention that the law under attack unlawfully delegates state legislative powers to Congress because amendments to the naturalization laws changing eligibility provisions operate to amend the state law without the consent of the people or the Legislature of this state has already been rejected by this court in *People* v. *Oyama* (1946), *supra*, 29 Cal.2d 164, 178,[11] in the following language: "The Legislature of this state has set up eligibility to citizenship as a primary standard, and because the determination of some fact or condition incorporated in this primary standard rests elsewhere than in the Legislature, or this requirement is to

prehensive stud of the expansion of Japanese farmers which has been made by one of their own countrymen, one Yamato Ichihashi, instructor in Japanese history and economics at Leland Stanford University. In 1915 Mr. Ichihashi published a volume on 'Japanese Immigration,' in which he presented detailed charts that brought out the following remarkable facts:

"Out of every 100 people growing berries in California, 88 are Japanese. Out of every 100 who raise sugar beets, 67 are Japanese. Out of every 100 who grow grapes, 52 are Japanese. Out of every 100 who raise vegetables (for market, of course), 46 are Japanese. Out of every 100 who grow citrus fruits, 39 are Japanese. Out of every 100 who grow deciduous fruits, 36 are Japanese.

"The State board [of Control], in commenting upon these findings, holds that the percentages would run considerably higher today."

In the same letter of transmittal of the report of the state board, the attitude of California in respect to the Japanese people was officially expressed by Governor Stephens as follows:

"It is also proper to state that I believe I speak the feelings of our people when I express to you a full recognition of the many admirable qualities of the Japanese people. We assume no arrogant superiority of race or culture over them. Their art, their literature, their philosophy, and, in recent years, their scientific attainments have gained for them a respect from the white peoples in which we, who know them so well, fully share. We have learned to admire the brilliancy of their art and the genius that these people display. We respect that deep philosophy which flows so placidly out of that wonderful past of theirs and which has come down through ages that antedate our Christian era. We join with the entire civilized world in our admiration of the tremendous strides which the Japanese nation itself has made in the last two generations unparalleled as its career is in the history of nations. We respect the right of the Japanese to their true development and to the attainment of their destiny.

"All these matters I am at pains to emphasize so as to convince you, and, through you the people of the United States, that this problem of ours is not an insignificant or temporary one. It is not factious. It has no origin in narrow race prejudice or rancor or hostility. It is, however, a solemn problem affecting our entire Occidental civilization." (P. 9 of "California and the Oriental" by State Board of Control of Calif., 1920 *ed.*)

See, also, discussion "Is This a Racial War?" in "Report From Tokyo" (Grew, 1942, p. 65, Simon and Schuster).

[11]See *Oyama* v. *State of California* (1948), 332 U.S. 633 [68 S.Ct. 269, 92 L.Ed. 249].

be measured by another standard not under the control of the state and which may be subject to change, does not amount to an unconstitutional delegation of legislative authority. [Citations.]'' (See, also, *Palermo* v. *Stockton Theatres, Inc.* (1948), *supra,* 32 Cal.2d 53, 59.)

I agree that the United Nations Charter, as presently constituted and accepted was not intended to, and does not, supersede existing domestic legislation of the United States or of the several states and territories.

I would hold that provisions of the Alien Land Law here invoked by the State of California do not contravene either the federal or state Constitutions; and would affirm the judgment of the trial court.

Shenk, J., and Spence, J., concurred.